UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:21-cv-00480-RJC-SCR

CSX TRANSPORTATION, INC,                )
                                        )
       Plaintiff,                       )
                                        )
       v.                               )
                                        )    **AMENDED ORDER[1]**
BONSAL AMERICAN, INC.,                  )
OLDCASTLE BUILDING PRODUCTS,            )
INC., OLDCASTLE LAWN & GARDEN,          )
INC., ABC CORPORTATIONS 1–10, and       )
JOHN DOES 1–10,                         )
                                        )
       Defendants.                      )

      **THIS MATTER** is before the Court on Defendants' Motion for Summary Judgement, (Doc. No. 66), Plaintiff's Motion for Partial Summary Judgment, (Doc. No. 69), Plaintiff's Motions to Strike, (Doc. Nos. 77, 79), Defendants' Motions to Strike, (Doc. Nos. 64, 67, 72, 74), the parties' Consent Motion to Continue (Doc. No. 123). For the reasons explained below, Defendants' Motion for Summary Judgment is **GRANTED IN PART, DENIED IN PART**, and **DENIED IN PART AS MOOT.** Plaintiff's Motion for Partial Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**. Defendants' Motion to Strike Mazzanti testimony, (Doc. No. 67), is **DENIED AS MOOT**. Plaintiff's and Defendants' remaining pending Motions to Strike are **DENIED WITHOUT PREJUDICE** to the parties' right to renew. The

---

[1] This Amended Order is issued solely to correct typographical errors on page 49 in the Court's prior order and in no way changes the substance of the Court's ruling on the matter.

1

parties' Consent Motion to Continue (Doc. No. 123) is **GRANTED**, and the Court will schedule a pre-trial conference to address setting a new trial date.

## I.    BACKGROUND

In late August 2018, off the west coast of Africa, a storm emerged, gathering strength as it moved across the Atlantic Ocean. As it approached the United States, it became the hurricane that we know as Florence.  When Hurricane Florence hit landfall in North Carolina, it created havoc wherever it went. Governor Roy Cooper would declare a state of emergency, and President Trump would follow with a declaration of a national emergency.

In the morning hours of September 14, 2018, Florence made landfall as a category one hurricane. Within days, a CSX freight train derailed on the Oldcastle sand and gravel mine property situated off Highway 74 near Lilesville in Anson County, North Carolina.

A subsequent tempest arose, a legal one, in which the parties to this litigation attempted to sort out vexing issues associated with that crash, such as who was to blame, what should or should not have been done, whether state or federal laws apply or preempt some or all the claims and defenses, the proper measure of damages, and assorted other issues addressed below.

### A.   The Parties

Plaintiff CSX is a Class 1 railroad providing interstate freight transportation services subject to the jurisdiction of the United States Surface Transportation Board.

2

(Doc. No. 71 at 4). Plaintiff operates as a rail common carrier over approximately 20,000 route miles of track in 23 states and the District of Columbia. (*Id.*).

The Oldcastle Defendants own and operate the Oldcastle sand and gravel mining and bagging plant facility located at 7772 US-74, Lilesville, North Carolina ("Property"). (Doc. No. 1 at ¶¶ 12–13). In 2001, Defendant Oldcastle acquired the Defendant Bonsal entities as well as control of the Property. (Doc. No. 71-A; Barnhill Dep. at 10:15–11:3).

### B. Oldcastle's Property

The Property's relevant mine sits between Highway 74 to the north and Plaintiff's right of way immediately to the south. (Doc. No. 94-9). The mine area is known as the "plant area" for its gravel bagging plant. (Doc. No. 71-A; Barnhill Dep. at 25:10–14, 29:5–25). Oldcastle mines material from the ground, runs it through a sifter that cleans and separates the gravel by size, and then sells the finished product in bags. (*Id.* at 29:18–25). A water recycling system encircles the plant area and works to capture runoff, separate solids, and pump freshwater north (uphill) for reuse in the mining operation. (Doc. No. 94-8; Doc. No. 94-6; Kiefer Dep. at 91:7–93:9, 155:4–156:21). A silt pond or "Wash Pond" sits uphill from Plaintiff's right of way. (Doc. No. 70-12 at 2). The exact measurements of the Wash Pond are disputed.[2]

---

[2] The measurements come from a Declaration of Michael Ports, whose opinions and testimony are subject to a pending motion to strike. (Doc. No. 72). Defendant alleges Plaintiff filed the Ports Declaration in violation of Fed. R. Civ. Pro. 26 and 37, (Doc. No. 102 at 4, 16), and requests the Court disregard it. (*Id.*). The Court has considered the argument, finds that it goes to weight not admissibility, will excuse the untimeliness, and will consider the affidavit.

Along the south hillside edge of the plant area, Oldcastle placed piles of sand or gravel bags for storage ("Stockpile Area"). (Doc. No. 71-2; Barnhill Dep. at 98:6–20). Oldcastle occasionally used the Stockpile Area and other stockpiles to create berms and divert water. (Doc. No. 71-2; Barnhill Dep. at 102:7–104:14). Plaintiff alleges that Oldcastle installed a pipe under the Stockpile Area to divert water to the main line. (Doc. No. 94-4; Lowe Dep. at 18:21–20:12). The parties dispute whether Oldcastle intentionally diverted water over Plaintiff's tracks. (Doc. No. 94 at 13). Defendants reject that any sandbags at the Stockpile Area were used as a makeshift dam on the property or that such a pipe was ever installed. (Doc. No. 70 at 4, 9; Doc. No. 70-29 at 7–8). Oldcastle used ditches and mud pools to collect water at the bottom of the hill. (Doc. No. 94-8; Oldcastle's 2018 Water Management Map). Overall, the water system encircled the Property, sending water through culverts and over land, naturally crossing Plaintiff's right of way. (*Id.*)

## C. Florence

On the morning of September 14, 2018, Florence made landfall as a category one hurricane but was downgraded to a tropical storm by 5:00 p.m. (ET). (Doc. No. 71-11; Altschule Dep. at 26:10–14). By the time of derailment, Florence had moved significantly southwest of the derailment area and was downgraded to a tropical depression. (*Id.* at 28:9–16). The parties dispute the amount of rainfall occurring during the derailment. (Doc. No. 71 at 5 (citing Doc. No. 71-11; Altschule Dep. at 109:21–110:4); Doc. No. 85 at 2 (citing Doc. No. 85-2)). On September 16, flash flood

warnings due to Florence remained in effect. (Doc. No. 71-19; Callaway Dep. at 127:15–20:19, 174:19–24).

### D. Before the Crash

On September 14, 2018, and throughout the storm, Plaintiff consulted with operations staff, weather consultants, and engineers to evaluate weather data to plan operations for Florence. (Doc. No. 71 at 5; Doc. No. 71-10; Albright Dep. at 20:24–22:24). In the early morning of September 15, Plaintiff halted X807 after members of the crew expressed concern about the conditions. (Doc. No. 85 at 2 (citing Doc. No. 85-3); Doc. No. 71-6; Detreville Dep. at 14:22–20:22).

On September 16, 2018, Plaintiff conducted train operations through the Monroe Subdivision. (Doc. No. 71 at 4). Plaintiff's train Q58315 ("Q583") departed from South Carolina as a "through freight" toward its ultimate destination, Hamlet, North Carolina, approximately 180 route miles away. (Doc. No. 71 at 5; Doc. No. 71-5; Gambrell Dep. at 11:12–12:14, 17:2–25). Train X807 was also running that day. (Doc. No. 71 at 4).

Prior to departure, the Q583 crew received a copy of a track bulletin containing relevant train dispatch advisories applicable at that time, including an advisory that a flash flood warning was in effect between railroad mileposts SF 264.9 and SF 293.9, which includes the derailment location. (Doc. No. 71-14; Cowan Dep. at 123:8–21; Doc. No. 71-15 (CSX Track Bulletin) at 4; Doc. No. 71-5; Gambrell Dep. at 158:7–159:7). In the afternoon, Plaintiff temporarily stopped X807 during a tornado warning

5

before allowing it to proceed. (Doc. No. 71-5; Gambrell Dep. at 54:1–8; Doc. No. 71-19; Callaway Dep. at 160:9-16).

Also on September 16, Plaintiff's inspector Jon Cowan performed a special inspection of the Monroe Subdivision, heading west (railroad South). (Doc. No. 71 at 8; Doc. No. 71-14; Cowan Dep. 48:17–50:7). Ordinarily, Plaintiff performs regular inspections of the Monroe Subdivision's main line track three times per week. (Doc. No. 71-14; Cowan Dep. at 40:6–8). Between approximately 12:30 p.m. (ET) and 1:30 p.m. (ET), Cowan performed a special inspection of the section of the track where the derailment occurred. (*Id.* at 166:24–167:6, 194:12–20). Upon completing his initial inspection, Cowan commenced a second special track inspection until his shift concluded but worked in the opposite direction (railroad north) behind the X807 and Q583 trains. (*Id.* at 198:14–199:6).

### E.   The Crash

Around 5:00 p.m. (ET), X807 traveled over the future derailment site without issue. (Doc. No. 71 at 4, Doc. No. 94 at 4). One hour later, at approximately 6:02 p.m. (ET), Q583 traveled that same route, proceeding at approximately 19 miles per hour, before it encountered a segment of collapsed, washed-out track bed, and derailed. (Doc. No. 71 at 4, 11; Doc. No. 71-6; Detreville Dep. at 9:9–25). The first locomotive containing the crew made it over the washout, but a series of locomotives and railcars behind the lead locomotive derailed into the washout. (Doc. No. 71 at 11).   Three locomotives were destroyed, and one was damaged but is in the process of repair. (Doc. No. 81-18; Kennedy Depo. at 5–6).

6

### F. CSX Employees Arrive at the Scene

On the evening of the 16th, Plaintiff's employees arrived at the derailment site to investigate. (Doc. No. 71 at 11; Doc. No. 71-S; Beverly Dep. 110:20–24; Doc. No. 71-R; Callaway Dep. 73:1–7). Chad Beverly, Plaintiff's then-Director of Track, determined that an extensive amount of water flowed into the washed-out track where the derailment occurred. (Doc. No. 71-11; Doc. No. 71-S; Beverly Dep. at 112:15–113:16). Beverly physically followed the water to its sources on the Oldcastle's adjacent, uphill sand and gravel mine. (Doc. No. 71 at 11; Doc. No. 71-S; Beverly Dep. at 115:2–116:18; Doc. No. 71-R; Callaway Dep. 80:24-82:5). Beverly and Callaway allegedly observed and documented water escaping from only two locations that converged at the bottom of the hill: the Wash Pond (Northwest of the derailment site) and the collapsed Stockpile Area (directly North of the derailment). (Doc. No. 71 at 11; Doc. No. 71-19; Callaway Dep. at 80:24–82:22 (pond), 116:21–118:1 (both), 152:9–22 (converging)). Beverly also observed high-water marks indicating water had receded. (Doc. No. 71-20; Beverly Dep. at 143:16–144:6).

### G. Procedural History

On September 10, 2021, Plaintiff filed the present action, asserting claims of negligence, negligence per se, res ipsa loquitor, trespass, nuisance, and unjust enrichment. (Doc. No. 1). Plaintiff seeks damages for injuries resulting from the alleged claims. (*Id.* at ¶ 24). On November 5, 2021, after a grant for an extension of time, Defendants timely filed an answer and counterclaim, which they subsequently amended and ultimately dismissed on July 21, 2022. (Doc. No. 26; Doc. No. 49). On

7

September 9, Defendants filed a Motion for Summary Judgment and motions to strike the opinions and testimonies of certain experts. (Doc. No. 64; Doc. No. 67; Doc. No. 66; Doc. No. 74). Also on September 9, Plaintiff filed a Motion for Partial Summary Judgment and motions to strike experts. (Doc. No. 69; Doc. No. 72; Doc. No. 77; Doc. No. 79). Both Plaintiff and Defendants filed timely responses and replies to all pending motions. In its briefing, Plaintiff voluntarily dismissed its claims for res ipsa loquitor and unjust enrichment. (Doc. No. 94 at 4 n.2). Additionally, Defendants expressed their intent to withdraw one of their pending motions—the Motion to Strike Mazzanti testimony. (Doc. No. 102 at 18). On December 19, 2023, the Court held oral arguments regarding the motions for summary judgment. (Doc. No. 110). Having been fully briefed and argued, these motions are now ripe for adjudication.

## II.     STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. *Id.* The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986) (internal citations omitted). "The burden on the moving party may be discharged by 'showing' . . . an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. *Id.* at 324. Instead, "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 818 (4th Cir. 1995). The Fourth Circuit has concluded that "evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment." *Maryland Highways Contractors Ass'n, Inc. v. State of Md.*, 933 F.2d 1246, 1251–52 (4th Cir. 1991) (finding that inadmissible hearsay evidence could not be considered on a motion for summary judgment) (citing *Rohrbough v. Wyeth Laboratories, Inc.,* 916 F.2d 970, 973–74 n.8 (4th Cir.1990); *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir.1990); *Randle v. LaSalle Telecommunications, Inc.,* 876 F.2d 563, 570 n.4 (7th Cir.1989); *Pink Supply Corp. v. Hiebert, Inc.,* 788 F.2d 1313, 1319 (8th Cir. 1986)).

9

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (citations omitted). The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. *Anderson*, 477 U.S. at 248. "If the evidence is merely colorable or is not significantly probative" such that a jury could not return a verdict for the other party, summary judgment is appropriate. *Id.* at 249–50 (cleaned up).

## III. DISCUSSION

### A. Defendants' Motion for Summary Judgment

In addressing Defendants' Motion for Summary Judgment, the Court takes the facts in the light most favorable to the nonmovant, Plaintiff CSX. Defendants move for summary judgment as to all of Plaintiff's claims for negligence, trespass, nuisance, and negligence per se. (Doc. No. 66 at 1–2).[3] Further, Defendants also argue that Plaintiff deploys an improper measure of damages and seeks summary judgment on that issue. Plaintiff responds that when all inferences are drawn in its favor, genuine issues of material fact exist as to evidence of flooding and erosion on Defendants'

---

[3] As stated earlier, Plaintiff voluntarily dismissed its claims of res ipsa loquitor (Count V) and unjust enrichment (Count VI) in its response, and the Court will not consider them. (Doc. No. 94 at 4 n.2). Defendants' Motion for Summary Judgment regarding Counts V and VI is denied as moot.

property, Defendants' intentional acts that imperiled the tracks downstream, and the issue of damages, (Doc. 94 at 26).

At the outset, as this Court sits in diversity jurisdiction, it will apply the substantive law of North Carolina. *Kingsley v. Brenda & Gene Lummus, Inc.*, No. 1:11CV32, 2012 WL 727091, at *9 (W.D.N.C. Mar. 6, 2012) (citing *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938)).

*1. Negligence*

"To prove negligence, a plaintiff must prove that "(1) defendant failed to exercise due care in the performance of some legal duty owed to plaintiff under the circumstances; and (2) the negligent breach of such duty was the proximate cause of the injury." *Id.* (citing *Whisnant v. Carolina Farm Credit*, 204 N.C. App. 84, 93–94, 693 S.E.2d 149, 156 (2010); *see Ward v. Carmona*, 368 N.C. 35, 37, 770 S.E.2d 70, 72 (2015); *Bridges v. Parrish*, 366 N.C. 539, 541, 742 S.E.2d 794, 796 (2013); *Fussell v. N.C. Farm Bureau Mut. Ins. Co.*, 364 N.C. 222, 226, 695 S.E.2d 437, 440 (2010)). "The law imposes upon every person who enters upon an active course of conduct the positive duty to exercise ordinary care to protect others from harm[] and calls a violation of that duty negligence." *Fussell*, 364 N.C. at 226, 695 S.E.2d at 440 (quoting *Council v. Dickerson's, Inc.,* 233 N.C. 472, 474, 64 S.E.2d 551, 553 (1951)).

"Negligence is not presumed from the mere fact of injury." *Stoltz v. Burton*, 69 N.C. App. 231, 234, 316 S.E.2d 646, 647 (1984). "Negligence is the failure to exercise proper care in the performance of a legal duty which the defendant owed the plaintiff under the circumstances surrounding them." *Shock v. Wells Fargo Bank, N.A.*, No.

11

5:23-CV-466, 2024 U.S. Dist. LEXIS 37812, at *7 (E.D.N.C. Mar. 4, 2024) (citing *Dunning v. Forsyth Warehouse Co.*, 272 N.C. 723, 725, 158 S.E.2d 893, 895 (1968); *Moore v. Moore*, 268 N.C. 110, 112, 150 S.E.2d 75, 77 (1966); *Coulter v. Catawba Cnty. Bd. of Educ.*, 189 N.C. App. 183, 185, 657 S.E.2d 428, 430 (2008)). "It is sufficient if by the exercise of reasonable care[,] the defendant might have foreseen that some injury would result from his conduct or that consequences of a generally injurious nature might have been expected. Usually[,] the question of foreseeability is one for the jury." *Slaughter v. Slaughter*, 264 N.C. 732, 735, 142 S.E.2d 683, 686 (1965) (citations omitted); *see also Fussell*, 364 N.C. at 226, 695 S.E.2d at 440.

### a. Duty and Breach

Plaintiff has put forward sufficient facts from which a reasonable jury could find Defendants had a duty to exercise reasonable care, and Defendants breached that duty. "[W]hether a duty exists [can be] a mixed question of law and fact." *Copeland v. Amward Homes of N.C., Inc.*, 269 N.C. App. 143, 150, 837 S.E.2d 903, 908 (2020) (citation omitted).

Defendants argue insufficient evidence exists to establish duty because they were not statutorily required to inspect the Wash Pond and Stockpile area, and Plaintiff cannot show Defendants knew or should have known of a potential breach. Without notice, Defendants argue, no duty exists because water flow erosion can occur quickly, without warning. (Doc. No. 70 at 9). Defendants argue its semi-annual inspection found no observable problems, the Wash Pond never previously failed, and

12

neither a routine visual check two days prior to the breach nor an inspection prior to the storm showed any issues. (Doc. No. 70-20; Doc. No. 70-22).

The record demonstrates Defendants entered a specific course of conduct when they created a water recycling system that impounds and diverts water throughout their property and around Plaintiff's right of way. In accordance with that conduct, Defendants had a duty to operate this system with reasonable care. Liability arises for "one who constructs and maintains a dam to impound the waters of a river or other stream into a reservoir" if "he was negligent in the original construction or subsequent maintenance of the dam." *Bowling v. City of Oxford*, 267 N.C. 552, 558, 148 S.E.2d 624, 628 (1966) (citations omitted). "[T]he owner of a dam is not bound to anticipate unprecedented storms or rainfalls." *Bruton v. Carolina Power & Light Co.*, 217 N.C. 1, 10 (1940). "But where the negligence of the defendant in the operation of its plant during unprecedented and unforeseeable storm or rainfall is a contributing factor in producing injury[,] . . . the defendant is not relieved from liability." *Id.*

Taking the evidence in a light most favorable to the non-moving party, it includes, testimony from Defendants' Plant Manager suggesting that Defendants knew of flooding in the Wash Pond and Stockpile Area during storms, they diverted this flooding downhill, and either intended for water to escape from the Wash Pond or were indifferent to the path the water traveled. When the Wash Pond began overflowing and eroding nearby roadways, Defendants allegedly installed an additional culvert to divert water toward Plaintiff's right of way. (Doc. No. 71-2; Barnhill Dep. at 89:5–22; 90:11–91:3). Evidence also shows that Defendants received

13

warnings to prepare for twenty inches of rain during Florence. (Doc. No. 94-20 (warning email); Doc. No. 94-14; Thompson Dep. at 93:11–94:9; Doc. No. 71-2; Barnhill Dep. at 108:10–18). Testimony from Defendants' employees indicates any pre-storm "inspections" were merely the result of a quick drive around the property. (Doc. No. 70-13 at 3–4; Doc. No. 70-13 at 7, 85:1–22; *see also* Doc. No. 70-26 at 3 (inspection was "probably about four days prior to the storm. Maybe a week prior to" the storm)).

Plaintiff has put forward sufficient evidence from which a reasonable jury could find that Defendants owed a duty of care regarding the care and maintenance of their water filtration system, especially during a heavy storm. A reasonable jury could rely on this same evidence to find Defendants failed to act reasonably in operating their water management system.

### b. Causation

Plaintiff sets forth sufficient evidence from which a reasonable jury could find that Defendants' negligence was a proximate cause of Plaintiff's injury. "It is not enough to establish liability if all that can be shown is that an actor was negligent. There must be a showing or determination of proximate cause." *King v. Allred*, 309 N.C. 113, 117, 305 S.E.2d 554, 557 (1983). Proximate cause

> is a cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries, and without which the injuries would not have occurred, and one from which a person of ordinary prudence could have reasonably foreseen that such a result, or consequences of a generally injurious nature, was probable under all the facts as they existed.

14

*Hairston v. Alexander Tank & Equip. Co.*, 310 N.C. 227, 311 S.E.2d 559, 565 (N.C. 1984). "Foreseeability of injury is thus an essential element of proximate cause." *Adams v. Mills*, 312 N.C. 181, 193, 322 S.E.2d 164, 172 (1984). Foreseeability "does not require that the actor should have been able to foresee the injury in the precise manner in which it actually occurred." *Adams v. Mills*, 312 N.C. 181, 193, 322 S.E.2d 164, 172 (1984). Whether a defendant's negligence is a proximate cause is ordinarily a question for the jury. *Norfleet v. Hall*, 204 N.C. 573, 169 S.E. 143, 145 (N.C. 1933).

Defendants point to still shots from the train's front-view camera arguing that they show no water moved across the tracks prior to derailment, and Plaintiff's theory is based entirely on speculative field observations occurring hours and days after the derailment. (Doc. No. 70 at 4 (citing Doc. No. 71-R; Callaway Dep. 164: 1–16)). Defendants contend the photos show a lack of matted down vegetation or erosion. (Doc. 70 at 3, 12; Doc. No. 70-7; Doc. No. 70-8; Doc. No. 70-9 at 3, 9, 32, 33)).

Not only does the Court find the scene presented in the photograph inconclusive, but an additional aerial photograph of the scene presents information from which a reasonable jury could conclude that the water came from Defendant's property. (Doc. No. 70-4; Doc. No. 70-9 at 3, 9, 32, 33 (still shots from lead-locomotive's front facing camera); Doc. No. 94-4 at 14 (aerial photo of scene)). Additionally, testimony from those who arrived shortly after the crash details their observations of the direction and flow of water, sourcing from Defendants' property. Thus, the Court finds there exists a genuine issue of material fact, and Plaintiff has alleged sufficient

15

facts from which a reasonable jury could find that Defendants' alleged negligent conduct proximately caused Plaintiff's injury.

Because the Court finds photographs of the scene and testimony of lay witnesses are sufficient evidence of a dispute of material fact regarding causation, the Court need not consider, at the summary judgment stage, the expert opinions provided by both parties. Such evidence "sets up a battle of the experts, which should not be resolved at summary judgment." *Reyazuddin v. Montgomery Cnty., Maryland*, 789 F.3d 407, 417 (4th Cir. 2015).

### 2. *Trespass*

Plaintiff argues that Defendants committed trespass when they intentionally and/or negligently directed the release and spread of water, mud, and other debris from its property onto Plaintiff's right of way. (Doc. No. 1 at ¶¶ 32–36). A trespass claim requires that (1) "plaintiff was in possession of the land at the time of the alleged trespass;" (2) "that defendant made an unauthorized, and therefore unlawful, entry on the land;" and (3) "that plaintiff was damaged by the alleged invasion of his rights of possession." *Rainey v. St. Lawrence Homes, Inc.*, 174 N.C. App. 611, 614, 621 S.E.2d 217, 220 (2005) (quoting *Jordan v. Foust Oil Co.*, 116 N.C. App. 155, 166, 447 S.E.2d 491, 498 (1994)). A trespass may be intentional or negligent. *Id.* ("[I]n the absence of negligence, trespass to land requires that a defendant intentionally enter onto the plaintiff's land.); *Wagner v. City of Charlotte*, 269 N.C. App. 656, 672, 840 S.E.2d 799, 809 (2020). "One's action of causing water to flow onto another's property can constitute such a trespass." *Shadow Group v. Heather Hills Home Owners Ass'n*,

156 N.C. App. 197, 201, 579 S.E.2d 285, 287 (citing *Wilson v. McLeod Oil Co. Inc.*, 327 N.C. 491, 398 S.E.2d 586 (1990), *reh'g denied*, 328 N.C. 336, 402 S.E.2d 844 (1991)).

The parties do not dispute that Plaintiff was in possession of the right of way at the time of the alleged invasion. Rather, Defendants argue Plaintiff cannot establish sufficient facts to create a genuine issue of material fact that Defendants caused water to enter Plaintiff's property prior to derailment or had notice that such entry of water would occur. (Doc. No. 70 at 13). Defendants argue Plaintiff fails to show that Defendants' entry was unlawful or that Plaintiff was damaged by Defendants' conduct. (*Id.*) For the reasons explained above, the Court finds that Plaintiff has put forth sufficient facts from which a reasonable jury could find Defendants either intentionally or negligently caused water to exit their property and enter Plaintiff's right of way.

### 3. Nuisance

"A nuisance is a non-trespassory invasion of the property rights of another." *Grant v. E. I. Du Pont De Nemours & Co., Inc.*, No. 4:91-CV-55, 1995 WL 18239435, at *5 (E.D.N.C. July 14, 1995), *aff'd sub nom. Stancill v. E.I. Du Pont De Nemours & Co.*, 91 F.3d 133 (4th Cir. 1996) (citing *Watts v. Pama Mfg. Co.*, 256 N.C. 611, 124 S.E.2d 809 (1962)). "In order to establish a claim for nuisance, a plaintiff must show the existence of a substantial and unreasonable interference with the use and enjoyment of its property." *Wagner v. City of Charlotte*, 269 N.C. App. 656, 670, 840 S.E.2d 799, 808 (2020) (quoting *Shadow Grp., LLC v. Heather Hills Home Owners*

*Ass'n*, 156 N.C. App. 197, 200, 579 S.E.2d 285, 287 (2003)); *see also Jordan v. Foust Oil Co.,* 116 N.C. App. 155, 167, 447 S.E.2d 491, 498 (1994).

However, when damages arise from a "'single physical injury, instead of an on-going injury[,]' the action sounds in negligence and not nuisance." *Wagner*, 269 N.C. App. at 671, 840 S.E.2d at 809 (first quoting *Walden v. Morgan*, 179 N.C. App. 673, 683, 635 S.E.2d 616, 624 (2006); and then citing *Boldridge v. Construction Co.*, 250 N.C. 199, 203, 108 S.E.2d 215, 218 (1959)).

Defendants argue Plaintiff cannot provide sufficient evidence for its nuisance claim for the same reason it puts forth in its other arguments—Plaintiff cannot show water came from Defendants' property to interfere with Plaintiff's use and enjoyment of their right of way. (Doc. No. 70 at 13–14). Additionally, Defendants argue that Plaintiff's nuisance claim should be dismissed because the alleged damages result from a single instance of flooding rather than an on-going, recurrent injury. (*Id.* at 14–16).

Defendants rely on *Wagner v. City of Charlotte*, 269 N.C. App. 656, 840 S.E.2d 799 (2020). In *Wagner*, a city water main pipe burst and damaged plaintiff's property. The court affirmed a grant of summary judgment to the city on the nuisance claim because the flooding arose from a single instance rather than an ongoing situation. *Id.* at 671, 840 S.E.2d at 809. The court of appeals distinguishes this from *Hughes*, where a failure in a city's sewage system led to recurring overflow of sewage into plaintiff's home. *Id.* Plaintiff attempts to argue that the cause of the injury must be recurrent, not the injury itself. (Doc. No. 70 at 20). But that is not the law. Where a

18

claim arises from a single injury, the claim sounds in negligence, not nuisance. The record, viewed in the light most favorable to Plaintiff fails to support a reasonable finding of a recurring injury. Thus, summary judgment is warranted.

*4. Negligence Per Se*

"The general rule in North Carolina is that the violation of a public safety statute constitutes negligence per se." *Stein v. Asheville City Bd. Of Educ.*, 360 N.C. 321, 326, 626 S.E.2d 263, 266 (2006) (cleaned up) (quoting *Byers v. Standard Concrete Prods. Co.,* 268 N.C. 518, 521, 151 S.E.2d 38, 40 (1966)). "Even when a defendant violates a public safety statute, the plaintiff is not entitled to damages unless the plaintiff belongs to the class of persons intended to be protected by the statute, and the statutory violation is a proximate cause of the plaintiff's injury." *Stein v. Asheville City Bd. Of Educ.*, 360 N.C. 321, 326, 626 S.E.2d 263, 266 (2006) (cleaned up) (first quoting *Baldwin v. GTE S., Inc.,* 335 N.C. 544, 546, 439 S.E.2d 108, 109 (1994); and then quoting *Hart v. Ivey,* 332 N.C. 299, 303, 420 S.E.2d 174, 177 (1992)).

Here, Plaintiff alleges that Defendants are negligent per se for violating the Dam Safety Law of 1967. (Doc. No. 1 at 8). Defendants counter that the law is inapplicable, but even if it were, Plaintiff cannot demonstrate Defendants' actual or constructive knowledge of the violation of a public safety statute. (Doc. No. 70 at 7). For the same reasons discussed regarding Defendants' alleged negligence, Plaintiff puts forth sufficient evidence that Defendant "knew or should have known" of a violation. *Lamm v. Bissette Realty, Inc.*, 327 N.C. 412, 416 (1990). Defendants do not argue proximate cause or whether the Dam Safety Law is a public safety statute.

19

Thus, the Court will consider only the argument before it—whether the Wash Pond and Stockpile Area are under the statute's jurisdiction.

### a. The Dam Safety Law (N.C. Gen. Stat. §§ 143-215.23–143.215.37)

The Dam Safety Law "provide[s] for the certification and inspection of dams in the interest of public health, safety, and welfare." N.C. Gen. Stat. § 143-215.24. The Dam Safety Law is regulated and enforced by the North Carolina Department of Environmental Quality ("NCDEQ"). The Dam Safety Law defines a dam as "[a] structure and appurtenant works erected to impound or divert water." *Id.* at § 143-215.25(1). The NCDEQ regulations separate dams into one of three levels: Class A (low hazard); Class B (intermediate hazard); and Class C (high hazard). 15A N.C. Admin. Code 2K.0105 (2018). A high hazard dam "includes dams located where failure will likely cause loss of life or serious damage to homes, industrial and commercial buildings, important public utilities, primary highways, or major railroads." *Id.* at 2K.0105(a)(3) (2018).

At the time of derailment, the Dam Safety Law exempted from its coverage any dam that "is less than 25 feet in height or that has an impoundment capacity of less than 50 acre-feet, unless the Department determines that failure of the dam could result in loss of human life or significant damage to property below the dam." N.C. Gen. Stat. § 143-215.25A(a)(6) (2018). Prior to 2011, the Dam Safety Law exempted dams that are "less than 15 feet in height or that [have] an impoundment capacity of less than 10 acre-feet." N.C. Gen. Stat. § 143-215.25A(a)(6) (2010). Dam height "shall be measured from the highest point on the crest of the dam to the lowest

20

point on the downstream toe." 15A N.C. Admin. Code 2K.0223(a) (2017). Accordingly, "[t]he total storage capacity of a dam shall be that volume which would be impounded at the elevation of the highest point on the crest of the dam." *Id.* at 2K.0223(b).

### b. *The Wash Pond*

Defendants argue the Wash Pond is exempt from the Dam Safety Law because its size qualifies it for an exemption, no evidence shows otherwise, and the NCDEQ allegedly knew about the Wash Pond and did not consider it a hazard within its jurisdiction. (Doc. No. 70 at 16–17; Doc. No. 70-36 at 4; Doc. No. 71-2; Barnhill Dep. at 97:4–17; Doc. No. 70-38 at 4).

Plaintiff disputes the size of the dam and surface area of its impoundment; argues that its size should have been calculated differently to include the North Ponds; this different calculation would not exempt it from coverage under the statute; and it is a high hazard dam that may endanger a major railroad, which is never exempt from regulation.[4] (15A N.C. Admin. Code 2K.0105; Doc. No. 94 at 23–25; Doc. No. 94-13 (Ports Affidavit[5]) at 3–4; Doc. No. 94-9 (Mining Map); Doc. No. 94-16; Joyner Dep. at 128:1–13; Doc. No. 94-6 at 141). Further, Plaintiffs argues that even if the Wash Pond qualified for an exemption under the statute, Defendants still should have engaged an engineer to evaluate the dam in light of relevant hazards. (Doc. No. 94 at 25; Doc. No. 94-16; Joyner Dep. at 158:20-159:4).

---

[4] Plaintiff misstates the law. N.C. Gen. Stat. § 143-215.25A provides eight distinct exemptions to the Dam Safety Law. *Id.* at § 143-215.25A(a). Nothing in the plain language of the statute indicates that all exemptions categorically do not apply to high-hazard dams.

[5] *See supra* text accompanying note 1.

Plaintiff has alleged sufficient facts from which a reasonable jury could find that the Wash Pond's size removes it from any exemption under the Dam Safety Law. Melissa Joyner, Defendants' witness from the NCDEQ, read during her deposition an email chain stating that the NCDEQ was aware of the Wash Pond and did not consider it a jurisdictional dam, but Ms. Joyner also stated she does not work in such classifications and does not have an opinion as to the size or volume of the Wash Pond. (Doc. No. 94-16; Joyner Dep. at 104:14–106:8, 163:21–164:2). Alternatively, Plaintiff has offered a Declaration from Michael Ports calculating the size of the Wash Pond as larger than what is covered by the exemption. There remains a question of fact for the jury as to whether Defendants' Wash Pond qualifies for an exemption under N.C. Gen. Stat. § 143-215.25A. Defendants' Motion for Summary Judgement regarding Count IV is denied as to the Wash Pond.

### c. The Stockpile Area

Defendants argue the Stockpile Area is exempt from the Dam Safety Law because it is not an impoundment, the sandbags were "never there to divert water;" it is less than 25 feet high; there is no evidence it had an impoundment capacity of more than 50 acre-feet; and no evidence shows the NCDEQ determined it to be a high hazard dam under N.C. Gen. Stat. § 143-215.25A(a)(6) that "could result in loss of human loss or significant damage to property below the dam." (Doc. No. 70 at 17; Doc. No. 70-42 at 3; Doc. No. 70-44 at 3; Doc. No. 70-34 at 5).

Plaintiff has put forth sufficient evidence from which a reasonable jury could conclude that the Stockpile Area impounded water, and this impoundment could have

22

qualified as a high hazard dam. Defendant alleges the Stockpile Area was no higher than five to ten feet at the time of derailment, however, it would not be exempted if it were classified as a high hazard dam. N.C. Gen. Stat. § 143-215.25A (a dam "that is less than twenty feet in height" is exempted where it "is not a high hazard dam"). The Court finds that a genuine issues of material fact exist as to whether the Stockpile Area impounded water, and further, whether it was exempted from jurisdiction under the Dam Safety Law. Defendants' Motion for Summary Judgment regarding Count IV is denied as to the Stockpiles.

### 5. *Damages*

Plaintiff seeks $8,092,227.90 for the destroyed locomotives—$2,697,409.30 per locomotive. (Doc. No. 111-5; Doc. No. 81-18 (Kennedy Depo.) at 4–5).[6] Defendants argue that Plaintiff's measure of damages for its three destroyed locomotives and one partially damaged locomotive are improper. (Doc. No. 70 at 18). Specifically, they argue the Court should limit damages for the destroyed locomotives to the FMV immediately prior to the derailment less the salvage value because a market for locomotives exists, and Plaintiff's method of calculating damages would result in a windfall for Plaintiff. Additionally, they argue the Court should limit damages for the partially damaged locomotive to cost of repairs. (*Id.* at 18–19; Doc. No. 70-15 (Railroad Appraisal Associates Report) at 14)). Defendants point to the opinion of Plaintiff's

---

[6] Deposition testimony gives the amount of $8,245,265.52. The Defendants supply the amount of $8,092,227.90.

damages expert, Patrick Mazzanti[7], who opined that the total FMV of the four locomotives immediately prior to the derailment amounted to $2,150,000.00.[8] (Doc. No. 70-15 (Railroad Appraisal Associates Report) at 5, 8).

Plaintiff argues the jury should determine whether a market exists, and Plaintiff should be permitted to present other competent evidence of its damages for the jury to use in determining FMV. Further, Plaintiff does not dispute that the cost of repairs is the proper measure, rather it claims that the repairs of the CSX 370 are ongoing, more information will develop in advance of trial, and the record will be supplemented accordingly. (Doc. No. 94 at 26).

"[T]he measure of damages used should further the purpose of awarding damages, which is to restore the victim to his original condition, to give back to him that which was lost *as far as it may be done by compensation in money*." *Shera v. N.C. State Univ. Veterinary Teaching Hosp.*, 219 N.C. App. 117, 126, 723 S.E.2d 352, 357 (quoting *Belcher v. Fleetwood Enters., Inc.*, 162 N.C. App. 80, 85, 590 S.E.2d 15, 19 (2004) (emphasis in original)). In North Carolina, "the measure of damage for injury to personal property is the difference between the market value of the property immediately before the injury and the market value immediately after the injury" at the time and place of injury. *U.S. Fid. & Guar. Co. v. P. & F. Motor Express*, 220 N.C.

---

[7] Defendant says it intends to withdraw its Motion to Strike Mazzanti testimony. The Court denies the motion to strike and will not address arguments regarding his testimony. (Doc. No. 102 at 18).

[8] Mazzanti found the FMV of the CSX 370 (built in 1998) was $450,000.00, the CSX 5411 (built in 2007) was $850,000.00, the CSX 6001 (built in 1972) was $450,000.00, and the CSX 6092 (built in 1975) was $400,000.00. (Doc. No. 70-15 (Railroad Appraisal Associates Report) at 5, 8).

721, 18 S.E.2d 116, 117 (1942) (citation omitted); *State v. Maynard*, 79 N.C. App. 451, 452, 339 S.E.2d 666, 667 (1986). FMV is often defined as "the amount which would be agreed upon as a fair price by an owner who wishes to sell but is not obliged to do so, and a buyer who wishes to buy but is not compelled to so." *Huff v. Thornton*, 287 N.C. 1, 12, 213 S.E.2d 198, 206 (1975).

The North Carolina Supreme Court has recognized that a fair market value calculation based solely on "the market value immediately before the injury and the market value immediately afterwards" is "often too remote from the factual pattern of the injury and its compensable items to reflect the fairness and justice which the administration of the law presupposes." Therefore, "it is applied with caution, and often with modifications designed to relax its rigidity and fit it to the facts of the particular case." *Carolina Power & Light Co. v. Paul*, 261 N.C. 710, 711, 136 S.E.2d 103, 104 (1964).

A jury may consider a variety of evidence when determining fair market value. *Southern Watch Supply Co. v. Regal Chrysler-Plymouth, Inc.*, 82 N.C. App. 21, 30 (1986). The jury "should fairly weigh and consider all of the evidence the parties have presented to [it]." *Huff*, 287 N.C. at 12. (affirming jury instructions on FMV that allowed consideration of evidence of damage before and after injury, sale price by a willing buyer and seller, costs of repairing the house, and costs of rebuilding the house). A jury is "not compelled to accept . . . the precise amounts suggested by any of the witnesses. *Id.*

25

Further, "if there is no market, there can be no market value." *Carolina Power & Light Co. v. Paul*, 261 N.C. 710, 711 (1964). This often arises "when the property is custom made or has been destroyed, [and] courts often determine its value based on the amount paid for the property in the most recent transaction for it" *Innovative Healing Sys., Inc. v. XPI Servs., LLC*, No. 3:21CV345, 2023 WL 1156997, at *8 (W.D.N.C. Jan. 30, 2023) (quoting *Weener Plastics, Inc. v. HNH Packaging, LLC*, 590 F. Supp. 2d 760, 766 (E.D.N.C. 2008)). Replacement cost is an appropriate measure of damages for destroyed property "when no market exists for it." *Id.* (citation omitted); *Appeal of AMP, Inc.*, 287 N.C. 547, 572 (1975) (listing factors for consideration in determining damages for destroyed property with no market, including "[c]ost of replacement or repair")).

Regarding damaged, but not destroyed, goods, the Supreme Court of North Carolina has held that cost of repairs is the appropriate measure of the extent of the damage. *Carolina Power & Light Co. v. Paul*, 261 N.C. 710, 711–12, 136 S.E.2d 103, 104 (1964). The supreme court cited with approval *Central Illinois Light Co. v. Stenzel*, which held "[w]here property had been damaged and can be repaired, true measure of damages is reasonable cost of repairs, providing that such is less than value of property before damage." 44 Ill. App. 2d 388, 394, 195 N.E.2d 207, 210 (1963) (citation omitted). "The purpose of the proviso is to prevent the owner of property from profiting by the injury." *Carolina Power & Light Co.*, 261 N.C. at 712, 136 S.E.2d at 105.

26

A question of fact remains as to whether a market exists for Plaintiff's locomotives. Testimony from one expert of a fair market value calculation is insufficient to establish a market for damages as a matter of law. The jury may consider additional evidence regarding the destroyed locomotives to determine whether a market exists, and if so, what constitutes a proper calculation of a fair market value based on the unique circumstances of the case. Here, a jury may find that an exact FMV calculation does not make Plaintiff whole. Thus, the Court will not limit Plaintiff's damages for the destroyed locomotives to a strict calculation. The proper measure of damages for the damaged locomotive is cost of repairs, but because repairs are ongoing, the Court denies Defendants' request to declare an exact amount or limit what evidence may be presented regarding repairs.

**B.  Plaintiff's Motion for Partial Summary Judgment**

In addressing Plaintiff's Motion for Summary Judgment, the Court takes the facts in the light most favorable to the nonmovant, Defendants. Plaintiff moves for summary judgment as to Defendants' affirmative defense of contributory negligence, arguing that the defense is premised on the idea that Plaintiff "should have suspended train operations or should have altered train schedules and inspection practices so as to inspect directly in front of trains X807 and Q583." (Doc. No. 71 at 13). Plaintiff argues this theory is an "unabashed attempt[]" at regulating rail operations via state tort law, which is preempted by federal law, specifically, the Interstate Commerce Commission Termination Act ("ICCTA") and the Federal Railroad Safety Act ("FRSA"). (*Id.*)

Plaintiff asserts that to the extent Defendants' contributory negligence defense is based on attempts to "regulate" the railroad, it is expressly preempted by the ICCTA. To the extent Defendants' affirmative defense is based on attempts to impose a standard of care inconsistent with federal regulations and Plaintiff's own rules, such attempts are preempted by the FRSA. (Doc. No. at 13). Plaintiff's motion does not ask the Court to consider the merits of Defendants' defense, rather, Plaintiff solely argues for preemption.[9]

In response, Defendants narrow their defense and argue that Plaintiff was contributorily negligent for six primary reasons:

1. Plaintiff failed to add a culvert at the derailment site (Milepost 270.4);

2. Plaintiff failed to conduct studies of expected water flow in the area of derailment;

3. Plaintiff failed to conduct a special track inspection(s) before the Q583 train traversed the derailment site;

4. Plaintiff's crew on the X807 train failed to report the unsafe conditions at Gravelton tracks and at the derailment site;

5. Plaintiff failed to take the safe course by ordering the Q583 train to proceed on September 16, 2018; and

---

[9] Plaintiff discusses the merits of the defense in its reply. (Doc. No. 102). But the Court will consider the motion as presented and look solely at preemption.

6. Plaintiff failed to take the safe course by not ordering the train to either suspend operations or remain stopped at Lilesville until it performed an inspection of the Gravelton tracks and derailment site. (Doc. No. 85 at 2).

The Court will address preemption for each of Defendants' arguments.

"Where a state statute conflicts with, or frustrates, federal law, the former must give way." *CSX Transp. v. Easterwood*, 507 U.S. 658, 663 (1993) (citing U. S. Const., Art. VI, cl. 2; *Maryland* v. *Louisiana*, 451 U.S. 725, 746, 68 L. Ed. 2d 576, 101 S. Ct. 2114 (1981)). "[F]ederal law can preempt state law expressly or by implication and . . . 'the purpose of Congress is the ultimate touchstone in every pre-emption case.'" *PCS Phosphate Co. v. Norfolk Southern Corp.,* 559 F.3d 212, 217 (4th Cir. 2009) (citing *Altria Group, Inc. v. Good*, 129 S. Ct. 538, 543, 172 L. Ed. 2d. 398 (2008)). The party claiming preemption bears the burden of showing that the claim or defense is preempted by federal law. *Great-W. Life & Annuity Ins. Co. v. Info. Sys. & Networks Corp.*, 523 F.3d 266, 270 (4th Cir. 2008). When a statute "contains an express pre-emption clause, we do not invoke any presumption against pre-emption but instead focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Puerto Rico v. Franklin California Tax-Free Tr.*, 579 U.S. 115, 125, 136 S. Ct. 1938, 1946, 195 L. Ed. 2d 298 (2016) (cleaned up).

The ICCTA grants the Surface Transportation Board exclusive jurisdiction over:

> (1) transportation by rail carriers, and the remedies provided in this part . . . with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and (2) the construction, acquisition,

29

operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State.

49 U.S.C. § 10501(b). The ICCTA expressly provides that "the remedies provided under [the ICCTA] with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." *Id.* This is also referred to as "express preemption" under the ICCTA. "Transportation" is defined to include:

> (A) a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and (B) services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property[.]

49 U.S.C. § 10102(9).

In *Edwards v. CSX Transportation, Inc.*, the Fourth Circuit stated that "[w]ith respect to express preemption, Congress narrowly tailored the [ICCTA] to displace only regulation,—that is, those laws and actions that may reasonably be said to have the effect of managing or governing rail transportation." *Edwards v. CSX Transp., Inc.*, 983 F.3d 112, 121 (4th Cir. 2020) (cleaned up); *Skidmore v. Norfolk S. Ry. Co.*, 1 F.4th 206, 213 (4th Cir. 2021). "'Those state or local laws that have a more remote or incidental impact on rail transportation'—think laws of general applicability, like local fire or plumbing codes—are not expressly preempted." *Id.* (citations omitted). The Fourth Circuit noted that many circuit courts "acknowledge that the Act's preemptive reach can encompass common-law tort actions, in addition to statutes and

30

ordinances." *Id.* (citations omitted). But the court noted that "not *all* common-law claims against railroads are preempted." *Id.* at 122 (emphasis in original).

In a negligence action, a defense of contributory or comparative negligence brought against a plaintiff railroad could effectively "regulate" the plaintiff railroad by imposing a common-law duty on the plaintiff railroad from which the jury would assess the railroad's negligence. *See, e.g., PCS Phosphate Co.*, 559 F.3d at 218 ("The STB's interpretation of [the express preemption clause] focuses on the regulatory nature of the remedies preempted."); *Barreto v. Titan Transp. Servs. LLC*, No. 3:22CV650, 2023 WL 6210763, at *3 (E.D. Va. Sept. 20, 2023). (finding that the ICCTA expressly preempts common-law tort claims that "seek to regulate the day-to-day operations at the railroad facility"). Thus, in determining whether a state common-law tort action is expressly preempted under the ICCTA, the question is whether the common-law duty imposed, either in a claim or an affirmative defense, "may reasonably be said to have the effect of managing or governing rail transportation." *Edwards*, 983 F.3d at 121 (citations omitted).[10]

A primary example of a preempted attempt to regulate rail transportation occurs "where that liability arises from a railroad's economic decisions such as those

---

[10] State common law "actions may be *impliedly* preempted if, in application, they have the effect of unreasonably interfer[ing]' with railroad transportation." *Edwards*, 983 F.3d at 121 (emphasis in original). When determining "whether the action constitutes an 'unreasonable interference,'" the Court must make a factual assessment of the effect of providing the claimed remedy." *PCS Phosphate Co.*, 559 F.3d at 221. Nevertheless, Plaintiff is not arguing for implied preemption. (Doc. No. 110 at 5:11–13 ("There is also an implied preemption that applies under ICCTA. That's not what we are arguing today. We're arguing express preemption.")).

pertaining to train length, speed or scheduling." *PCS Phosphate Co. v. Norfolk Southern Corp.*, 559 F.3d 212, 220 (4th Cir. 2009) (citation omitted); *Franks Inv. Co. LLC v. Union Pac. R.R. Co.*, 593 F.3d 404, 411 (5th Cir. 2010) ("[A] tort suit that attempts to mandate when trains can use tracks and stop on them is attempting to manage or govern rail transportation in a direct way.").

Plaintiff contends that the ICCTA preempts Defendants' defense because central to the defense is the argument that Plaintiff should have ceased or altered operations. Specifically, Plaintiff argues Defendants seek to control special inspections, which in turn would alter the timing and coordination of trains, and ultimately regulate Plaintiff's railroad operations. (Doc. No. 70 at 17).

The FRSA preempts imposing a standard of care inconsistent with federal regulations. "Congress enacted the FRSA 'to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents.'" *Harris v. Norfolk S. Ry. Co.*, 784 F.3d 954, 957 (4th Cir. 2015) (quoting 49 U.S.C. § 20101). The FRSA preempts state law where a regulation or order "cover[s] the subject matter of the State requirement." 49 U.S.C. § 20106(a)(2). A party asserting preemption "must establish more than that [the regulations] 'touch upon' or 'relate to' that subject matter." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993). The FRSA preemption applies where "the FRSA regulation substantially subsumes the subject matter of the relevant state law." *Id.*

Even when the FRSA "substantially subsumes" certain subject matter, preemption does not apply in some circumstances:

32

- First, the FRSA preemption does not apply to a common-law claim that a party "'has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation . . . covering' laws, regulations, and orders related to railroad safety." *Harris*, 784 F.3d at 962 (quoting 49 U.S.C. § 20106(b)(1)(A)).

- Second, it does not apply when the party "has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by either of the Secretaries." 49 U.S.C. § 20106(b)(1)(B).

- Third, the FRSA preemption does not apply "when the law, regulation, or order is necessary to eliminate or reduce an essentially local safety or security hazard; is not incompatible with a law, regulation, or order of the United States Government; and does not unreasonably burden interstate commerce." 49 U.S.C. § 20106(a)(2).

### 1. Culverts

Defendants argue that Plaintiff was contributorily negligent for failing to add a culvert at the area of derailment. (Doc. No. 85 at 11). Plaintiff urges that express preemption under the ICCTA applies to the extent that Defendants' theory of contributory negligence attempts to regulate the railroad. (Doc. No. 70 at 15–18). Defendants responded to Plaintiff's briefing with their six theories of contributory negligence and argued generally that the ICCTA does not preempt its arguments. In oral argument at the summary judgment hearing, Plaintiff argued that Defendants'

33

theory dealt with track construction and as such, should be preempted under the ICCTA. (Doc. No. 110 at 13:17–14:8).

In *Edwards*, the Fourth Circuit preempted tort claims based on, among other theories, a "fail[ure] to install a floodgate (or similar permanent fix)." *Edwards v. CSX Transp., Inc.*, 983 F.3d 112, 120 (4th Cir. 2020). The Fourth Circuit found this "squarely implicate[s] questions . . . that Congress has reserved for the [Surface Transportation Board]." *Id.* (citation omitted). Establishing a standard of care that affects a railway's construction and operation, like what materials a railway uses or when a railway must install permanent structures, is regulatory, and thus, preempted. *Id.* at 123; s*ee also Skidmore*, 1 F.4th at 215 (finding the ICCTA expressly preempts a quiet title action regarding a right of way a defendant railway used for drainage because the railway's need to ensure proper drainage is essential to the maintenance of the tracks, and preventing its access would amount to a regulation). Thus, Defendants' contributory negligence defense is preempted under the ICCTA to the extent that it is based on Plaintiff's failure to install culverts within the railway.

Because the Court finds this theory of contributory negligence based on a failure to install culverts is preempted under the ICCTA, the Court need not address Plaintiff's argument for preemption under the FRSA.

### 2. *Hydraulic Studies*

In response to Plaintiff's general preemption argument, Defendants argue that Plaintiff failed to conduct any flood or hydraulic studies or investigations at any point

34

to determine the expected waterflow for the area of derailment. (Doc. No. 85 at 11).

ICCTA

Although closely related to the addition of culverts, the Court finds that a contributory negligence defense based on a failure to conduct hydraulic studies is not preempted under the ICCTA. The parties failed to specifically argue why such studies should or should not be expressly preempted under the ICCTA. Nevertheless, the Court finds that unlike imposing a duty to physically install culverts on a railway, imposing a duty to conduct studies related to track flooding does not directly regulate, manage, or govern the actual railway. Rather, such a duty seeks to ensure the railway's awareness of the conditions surrounding its tracks. As such, the Court finds this theory is not preempted under the ICCTA.

d. *FRSA*

In its response to Plaintiff's motion, Defendants specifically argue that under the FRSA preemption analysis, federal regulations do not substantially subsume the area of hydraulic or flood studies. (Doc. No. 85 at 11). Defendants contend only one FRA regulation addresses drainage, and one regulation is insufficient to "substantially subsume" the area of drainage and flood studies. *See Gallo v. Union Pac. R.R. Co.*, 372 F. Supp. 3d 470, 484 ("Although Section 213.33 mentions drainage, it merely touches upon, rather than substantially subsumes, the subject matter"). The Court agrees.

Section 213.33 provides that "[e]ach drainage or other water carrying facility under or immediately adjacent to the roadbed shall be maintained and kept free of

35

obstruction, to accommodate expected water flow for the area concerned." 49 C.F.R. § 213.33. One other regulation mentions drainage. *Id.* at § 213.103(c) ("[A]ll track shall be supported by material which will [p]rovide adequate drainage for the track."). Two regulations do not "substantially subsume" the area of drainage. Thus, Defendants' allegations of Plaintiff's contributory negligence for failing to conduct flood or hydraulic studies are not preempted by the FRSA.

### 3. Failure to Conduct Special Track Inspections

#### a. ICCTA

Plaintiff argues that a contributory negligence defense based on a failure to inspect is preempted by the ICCTA because it serves as a regulation for when trains should stop on the tracks, which is an "unabashed attempt[] to regulate how the railroad operates using state tort law principles." (Doc. No. 71 at 13). Plaintiff relies on testimony from expert Pagels[11] to argue that additional special inspections could result in a larger effect on networked train operations. (Doc. No. 71 at 17 (citing Doc. No. 71-7; Pagels Dep. at 145:140:25–143:15)).

Defendants respond by arguing that executing additional special inspections would not amount to an unreasonable burden on Plaintiff, so it would not be preempted under the ICCTA. But the analysis for express preemption does not involve looking at the reasonableness of the conduct at issue—such an inquiry falls under implied preemption.

---

[11] Plaintiff has a pending motion to strike Pagels' opinions and testimony, (Doc. No. 78), but the fact Plaintiff asserts here does not go to the heart of the motion.

The Court finds the ICCTA does not expressly preempt a defense of contributory negligence based on failure to conduct special inspections because special inspections deal with safety and do not directly regulate the maintenance of tracks or when a train starts or stops. *Sigman v. CSX Corp.*, No. 3:15-13328, 2016 U.S. Dist. LEXIS 60718, at *77 (S.D. W. Va. May 5, 2016) (noting claims based on a failure to inspect are not preempted by the ICCTA "[b]ecause those claims relate to rail safety, and do not amount to the economic regulation of railroads"). Thus, this theory of contributory negligence is not preempted under the ICCTA.

a. FRSA

The Court agrees with Plaintiff that the FRSA preempts a contributory negligence defense based on failure to conduct special inspections because promulgated regulations govern and subsume the area of track maintenance and inspections. (Doc. No. 71 at 18). The numerous sections regulating inspections indicate that federal regulations substantially subsume the subject matter of inspections. 49 C.F.R. §§ 213.231–213.241; *see In re Derailment Cases*, 416 F.3d 787, 794 (8th Cir. 2005) ("[A] regulatory framework need not impose bureaucratic micromanagement in order to substantially subsume a particular subject matter."); *Fed. Ins. Co. v. Burlington N. & Santa Fe Ry. Co.*, 270 F. Supp. 2d 1183, 1187 (C.D. Cal. July 7, 2003) (finding "the maintenance, repair, and inspection of track conditions is directly and comprehensively covered by the FRSA" in section 213); *Trimbur v. Norfolk Southern Ry.*, No. 2:13-cv-0160, 2015 U.S. Dist. LEXIS 104803, at *22–23 (S.D. Ohio Aug. 10, 2015); *Indem. Ins. Co. of N. Am. v. BNSF Ry. Co.*, No.

37

4:16-CV-763, 2017 U.S. Dist. LEXIS 215626, at *19 (E.D. Tex. Sept. 29, 2017) (citation omitted) ("[T]he standard of care for inspections of track conditions 'is directly and comprehensively covered by the FRSA.'").

However, Defendants argue exceptions to preemption apply—specifically, they argue Plaintiff violated 49 C.F.R. § 213.239 when it failed to conduct additional track inspections before Q583 traversed the derailment location, (Doc. No. 85 at 13), and Plaintiff failed to conduct additional track inspections in violation of both the FRA Safety Advisory 97-01 (SA 97-01) and its internal rule promulgated pursuant to federal regulations, MWI 1110-02. (Doc. No. 85 at 15).

### i. Failure to Comply with 49 C.F.R. § 213.239

Although, the Court finds the FRSA substantially subsumes the subject matter of inspections, preemption does not apply where the allegation is based on a party's "fail[ure] to comply with . . . a federal standard of care established by a regulation or order." 49 U.S.C. § 20106(b)(1)(A).[12] Section 213.239 provides that "in the event of fire, flood, severe storm, or other occurrence which might have damaged track structure, a special inspection shall be made of the track involved as soon as possible after the occurrence and, if possible, before the operation of any train over that track." 49 C.F.R. § 213.239. (Doc. No. 85-25; Doc. No. 85-27). Plaintiff argues it complied with all special inspection requirements. (Doc. No. 71-7 at 93:22-94:5).

---

[12] Plaintiff incorrectly argues that reference to any internal rules is preempted by the federal regulations. The cases Plaintiff cites for this proposition come before this language was added to section 20106. (Doc. No. 71 at 20).

38

It is undisputed that on September 16, 2018, Plaintiff conducted a special inspection of the derailment site around 12:30 p.m. (ET). The plain language of the statute does not require ongoing inspections for a single occurrence. But Defendants argue that additional potential tornadoes at 3:30 p.m. (ET) and 5:15 p.m. (ET). constituted additional "occurrences" under section 213.239 such that Plaintiff should have inspected the tracks again prior to derailment. (Doc. No. 71 at 14). Additionally, Defendants contend that at 4:54 p.m. (ET), X807 noticed high water on the tracks and at 4:56 p.m. (ET), X807 noticed compromised track bed at the derailment site. (*Id.*).

The Court finds that the plain language of section 213.239 requires a special inspection for each time the statute is triggered. Thus, additional "occurrences" may trigger the need for additional inspections. But according to the plain language of the regulation, Plaintiff was only required to inspect prior to the operation of a train over the affected rail "if possible." *Hendrickson v. Rapid City, Pierre & Eastern R.R.*, 2024 U.S. Dist. LEXIS 39247, at *20–21; *Indem. Ins. Co. of N. Am. v. BNSF Ry. Co.*, 2017 U.S. Dist. LEXIS 215626, *19–20.

A genuine issue of material fact exists as to whether additional occurrences arose such that Plaintiff had a duty to conduct another special inspection. Defendants allege that on September 16, at 2:13pm, an additional flash flood warning was issued for Anson County after the 12:30 p.m. (ET) inspection, and at 3:24 p.m. (ET), a dispatcher issued a tornado warning in the area of derailment. (Doc. No. 85-2 at 20, 35; Doc. No. 85-12 at 5). Such warnings could trigger a duty under section 213.239 if

39

they were new warnings. Thus, the Court finds Defendants put forth sufficient evidence of additional occurrences to trigger Plaintiff's duty under section 213.239. To the extent these or other alleged occurrences are based on disputed facts, a jury must make such determinations.

Further, a jury must determine based on the circumstances whether it was "possible" for Plaintiff to inspect prior to derailment. If it was possible for Plaintiff to inspect between these afternoon "occurrences" and prior to derailment, then Plaintiff violated section 213.239. Defendants have put forth sufficient evidence that additional inspections prior to derailment were possible. (Doc. No. 85 at 14; Doc. No. 85-33 (discussing ability to conduct additional inspection). The Court will not preempt Defendants' theory based on Plaintiff's failure to follow section 213.239 because a genuine issue of material fact exists for the jury to determine whether additional "occurrences" arose, and whether additional special inspections prior to derailment were possible.

### ii. Failure to Comply with FRA Safety Advisory 97-01

Defendants argue Plaintiff also violated SA 97-01 and such a violation falls under an exception to preemption. According to SA 97-01, after the receipt of a flash flood warning which might damage track or bridges:

> the railroad should notify train crews and limit the speed of all freight and passenger trains to that which will permit the train to operate safely, consistent with the potential water levels and visibility conditions, on all track subject to damage from the flood. The limitations should continue until a special inspection in accordance with 49 CFR 213.239 has been performed of that track and it is determined that a hazard no longer exists. In making that inspection and determination,

the time taken for the heaviest flow of water to reach the track should be considered.

SA 97-01(2) (Doc. No. 85-37 at 1–3). Plaintiff argues SA 97-01 is a nonbinding recommendation. (Doc. No. 71 at 20). The Court agrees. Defendants do not cite to any authority finding SA 97-01 binding. Section 213.239's exception to preemption is based on whether the party violated a "federal standard of care established by a regulation or order." 49 U.S.C. § 20106(b)(1)(A)-(B). A safety advisory is not a binding regulation, and Defendants have not provided any authority establishing it as such. *Indem. Ins. Co. of N. Am. v. BNSF Ry. Co.*, No. 4:16-CV-763, 2017 U.S. Dist. LEXIS 215626, at *12 (E.D. Tex. Sept. 19, 2017) (noting 97-1 was not adopted as a regulation, so it cannot establish a federal standard of care); *see Track Safety Standards*, 63 Fed. Reg. 33992, 34013 (noting the safety advisory contains "recommended procedures that reflect best industry practice for special track inspections"). Thus, Defendant's argument based on a violation of SA 97-01 is preempted.

### iii. Failure to Comply with Internal Regulation MWI 1110-02

Defendants further argue that Plaintiff failed to comply with MWI 1110-02, Plaintiff's internal regulation governing special inspections during flash flood warnings. (Doc. No. 91-2). Defendants argue that MWI 1110-02 was adopted pursuant to section 213.239, so it falls under the exception to preemption. (Doc. No. 85 at 15 n.6). In support of its argument, Defendants contend that MWI 1110-02 is based on SA 97-01, which in turn is based on section 213.239. (Doc. No. 85 at 16).

41

For MWI 1110-02[13] to establish a standard of care that is not preempted by a federal regulation, the Court must find the internal rule was "adopted pursuant to a regulation." 49 U.S.C. § 20106(b)(B). Plaintiff argues that for an internal rule to be "created pursuant to" a federal regulation, the specific regulation must "affirmatively mandate" adoption of the rule. (Doc. No. 85 at 9–10). Many courts join Plaintiff in this argument. *Tipton v. CSX Transportation, Inc.*, No. 3:15-CV-311, 2017 WL 10398182, at *21 (E.D. Tenn. Oct. 25, 2017) (collecting cases) ("[T]he overwhelming majority of federal courts to address this issue have concluded that a railroad operating rule is only created 'pursuant to' federal law if a specific regulation affirmatively mandates adoption of the rule."); *Harris v. Norfolk S. Ry. Corp.*, No. 2:11-CV-00497, 2012 WL 6209164, at *6 (S.D.W. Va. Dec. 13, 2012), *aff'd in part, rev'd in part on other grounds sub nom. Harris v. Norfolk S. Ry. Co.*, 784 F.3d 954 (4th Cir. 2015) (finding that for an internal operating rule to be promulgated "pursuant to" a federal regulation, such federal regulation must require railroads to adopt internal standards of care); *Rhinehart v. CSX Transp., Inc.*, No. 10-CV-86, 2017 WL 3500018, at *12 (W.D.N.Y. Aug. 16, 2017) ("[I]nternal rules are not preempted when they are adopted pursuant to—i.e., required by—federal law."). Thus, to survive preemption, Defendants must show the internal regulation was mandated by a federal regulation.

---

[13] MWI 1110-02 denotes that during heavy rain the tracks should be inspected, and severe weather and flash flood warning conditions require periodic inspection and temporary speed restrictions, among other things, to protect train operations. (*Id.* at Doc. No. 91-2 at 3 ("The track inspections will be performed periodically until the severe weather-flash flood warning conditions have passed. Temporary speed restrictions, taking the track out of service and other appropriate measures will be used, as necessary, to protect trains operations.").

The Court finds that Defendants fail to specifically argue why MWI 1110-02 was adopted pursuant to section 213.239, and nothing in the plain language of section 213.239 indicates such internal rules were required. As such, Defendants' theory of contributory negligence based on Plaintiff's violation of its own internal operating rules regarding inspections is preempted by federal law.

### iv. Failure to Avoid a Known, Local Safety Hazard and/or a Specific, Individual Hazard

Last, Defendants argue that Plaintiff's failure to conduct special track inspections is not preempted because Plaintiff failed to avoid a known, local safety hazard.[14] Specifically, Defendants argue that a combination of factors in the derailment area constituted such a hazard, which Plaintiff could have avoided. (Doc. No. 85 at 18–19 (listing factors)). Such factors include, for example, poor visibility, historic rainfall, power failures, and X807's observations of high water, as well as alleged facts indicating Plaintiff's awareness over time of issues with the track. (*Id.*).

"Even after federal standards have been promulgated, the States may adopt more stringent safety requirements 'when necessary to eliminate or reduce an essentially local safety hazard,' if those standards are 'not incompatible with' federal laws or regulations and not an undue burden on interstate commerce." *CSX Transp. v. Easterwood*, 507 U.S. 658, 662 (1993). This is not merely a factual inquiry surrounding the circumstances. *Id.* at 665. "Generally, courts which have considered

---

[14] Despite Defendants arguments separating a "local safety hazard" from a "specific, individual hazard," courts use these phrases interchangeably to help describe the other.

this issue have ruled that a "specific individual hazard" must be a discrete and truly local hazard such as a child standing on the railway." *Seyler v. Burlington N. Santa Fe Corp.*, 102 F. Supp. 2d 1226, 1236 (D. Kan. 2000) (citation omitted); *accord O'Bannon by & Through O'Bannon v. Union Pac. R.R.*, 960 F. Supp. 1411, 1420 (S.D. Mo. April 8, 1997).

Extreme weather, without more, is not a "local safety hazard." In *Cox v. Norfolk & W. Ry.*, the district court found that the snowy weather did not constitute a "specific, individual hazard" because snow was not "discrete and truly local to this locality." 998 F. Supp. 679, 685 (S.D.W.V. March 4, 1998). Defendants attempt to distinguish this case by noting that the district court acknowledged that no snow was falling when the accident occurred, it was not foggy, and the train had good visibility. *Id.* In *Seyler v. Burlington Northern Santa Fe Corp*, the district court found that "heavy rainfall, combined with a weather service flash flooding warning, is not a 'specific, individual hazard.'" 102 F. Supp. 2d 1226, 1237 (D. Kan. May 31, 2000).

The Court finds the weather at issue did not constitute a local safety hazard. The historic rainfall, potential for flooding, and difficulty in stopping the train do not constitute the type of local safety hazard that the Secretary would be unable to account for in its regulations. *Cox v. Norfolk & W. Ry.*, 998 F. Supp. 679, 685 (S.D. W. Va. March 4, 1998) ("Such a holding would also mean that the Secretary only took into account perfect weather conditions" when promulgating regulations.). Further, this historic rainfall and other factors Defendants put forth occurred over time. A slower accumulation of factors distinguishes the present case from the classic

44

example of a child suddenly on the tracks, which requires an imminent reaction. Thus, this argument does not save Defendants from preemption.

### 4. Failure to Report Unsafe Conditions

Neither Plaintiff nor Defendants specifically argue how contributory negligence based on a failure to report does or does not amount to a regulation under the ICCTA. As such, the Court will turn to whether this argument is preempted under the FRSA.

Plaintiff argues that allegations of X807's observance of conditions at the derailment are purely speculative, and the X807 crew had no duty to report the derailment site for "low ballast, exposed ties, or 'steep slope.'" (Doc. No. 105 at 13). Defendants contend that Plaintiff violated its own internal rules, or in the alternative, violated 49 C.F.R. § 213.5. The Court finds that reporting of track conditions to track owners is substantially subsumed by federal regulations regarding inspections. 49 C.F.R. § 213.5 (duty of track owners to act upon notice of track's lack of compliance); *Id.* at § 213.7 (designation of persons to inspect tracks); *Id.* at § 213.233 (visual track inspection and report requirements); *Id.* at § 213.113 (duty upon notice of defective rails). The regulations identify who has a duty to inspect tracks and to whom any discovered defects must be reported, among other requirements. The regulations substantially subsume the subject matter of inspections and reporting. Any defense based on failure to report is preempted unless an exception applies.

45

Defendants argue that Plaintiff violated 49 C.F.R. § 213.5 for failing to report, which would qualify as an exception to preemption. The Court disagrees. Section 213.5 imposes a duty on track owners, not conductors or engineers. *Id.* at § 213.5. The X807 crew does not amount to a track owner, so it does not have a duty under section 213.5. Based on the evidence presented, this attempt to escape preemption fails. Further, Defendant fails to show that Plaintiff's internal rules were created "pursuant to" a federal regulation. As such, a theory of contributory negligence based on Plaintiff's failure to comply with its own reporting requirements is preempted.

Alternatively, Defendants argue that the failure to report theory is not preempted because of the local safety hazard exception. Defendants cite the same reasoning and factors previously mentioned for why the situation amounted to a local safety hazard. The Court rejects this argument for the same reasons previously mentioned. As such, this exception does not apply, and the defense of failure to report is preempted.

5.  *Ordering Q583 to Proceed on September 16, 2018 and Failing to Suspend Operations or Remain Stopped until an Inspection is Performed*

Defendants argue that Plaintiff violated its own regulations and section 213.5 when it did not stop that day, and that the conditions constituted a local safety hazard. Plaintiff argues that any of Defendants' theories based on attempting to control when the trains stop or start are expressly preempted under the ICCTA as an attempt to regulate the railway. The ICCTA preempts common-law negligence claims "where that liability arises from a railroad's economic decisions such as those pertaining to train length, speed or scheduling." *PCS Phosphate Co. v. Norfolk*

46

*Southern Corp.*, 559 F.3d 212, 220 (2009) (quoting *Friberg v. Kansas City S. Ry. Co.*, 267 F.3d 439, 444 (5th Cir. 2001)). "It is clear that a tort suit that attempts to mandate when trains can use tracks and stop on them is attempting to manage or govern rail transportation in a direct way." *Edwards v. CSX Transportation, Inc.*, 983 F.3d 112, 123 (4th Cir. 2020) (quoting *Franks Inv. Co. LLC v. Union Pac. R. Co.*, 593 F.3d 404, 411 (5th Cir. 2010)).

Accordingly, this Court finds that any arguments that Plaintiff should have ceased or altered operations on September 16, 2018, are expressly preempted by the ICCTA because such arguments attempt to impose regulations on Plaintiff regarding when and how to run its trains. Because this Court finds these arguments are preempted under the ICCTA, it need not consider the parties' arguments regarding whether, under the FRSA, the defense is preempted or falls within an exception to preemption.

## C.  Pending Motions to Strike

In reaching its conclusions, the Court did not rely on any testimony or evidence found in the pending motions to strike, and the Court will not consider the arguments regarding experts at this time. Accordingly, the Court denies the pending motions to strike without prejudice but will fully consider the matters before trial in response to motions in limine or renewed motions to strike. Permitting the parties to refile these motions will ensure that the parties and the Court have the benefit of full briefing in the context of the narrowed case and the issues that remain.

## IV.  CONCLUSION

**IT IS, THEREFORE, ORDERED** that:

1. Defendant's Motion for Summary Judgment, (Doc. No. 66), is **GRANTED IN PART, DENIED IN PART, and DENIED IN PART AS MOOT** as follows:

   a. Defendants' Motion for Summary Judgment is **DENIED AS MOOT** with respect to Plaintiff's claims for unjust enrichment and res ipsa loquitor.

   b. Defendants' Motion for Summary Judgment is **DENIED** as to Plaintiff's claims for: Negligence; Trespass; Negligence Per Se; and Damages.

   c. Defendants' Motion for Summary Judgment is **GRANTED** as to Plaintiff's claim for Nuisance.

2. Plaintiff's Motion for Partial Summary Judgment, (Doc. No. 69), is **GRANTED IN PART and DENIED IN PART** as follows:

   a. Plaintiff's Motion for Partial Summary Judgment is **GRANTED** as to following bases underlying Defendants' contributory negligence defense:

      i. Plaintiff's failure to install culverts because it is preempted under the ICCTA;

      ii. Plaintiff's failure to comply with FRA Safety Advisory 97-01 because it is preempted under the FRSA;

48

iii. Plaintiff's failure to comply with its internal regulation, MWI 1110-02 because it is preempted under the FRSA;

iv. Plaintiff's failure to avoid a known, local safety hazard because it is preempted under the FRSA;

v. Plaintiff's failure to report unsafe track conditions because it is preempted under the FRSA; and

vi. Plaintiff's ordering of Q583 to proceed on September 16, 2018, and failure to suspend operations or remain stopped until an inspection was performed because they are preempted under the ICCTA.

b. Plaintiff's Motion for Partial Summary Judgment is **DENIED** as to following bases underlying Defendants' contributory negligence defense:

i. Plaintiff's failure to conduct hydraulic studies because it is not preempted under the ICCTA or FRSA; and

ii. Plaintiff's failure to comply with 49 C.F.R. § 213.239 because genuine issues of material fact remain.

3. Plaintiff's Pending Motions to Strike, (Doc. Nos. 77, 79), are **DENIED WITHOUT PREJUDICE** to Plaintiff's right to renew.

4. Defendant's Motion to Strike the opinions and testimony of Patrick Mazzanti (Doc. No. 67) is **DENIED AS MOOT**.

49

5. Defendants' remaining Motions to Strike (Doc. Nos. 64, 72, 74). are **DENIED WITHOUT PREJUDICE** to Defendants' right to renew.

6. The parties' Consent Motion to Continue (Doc. No. 123) is **GRANTED**. The Court will schedule a pre-trial conference at which time it will address setting a new trial date.

Signed: October 28, 2024

Robert J. Conrad, Jr.
United States District Judge

SEALED DOCUMENT with access to All Parties/Defendants.