# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

## AT CHARLOTTE

CSX TRANSPORTATION, INC.,

        Plaintiff,

v.                                    CIVIL ACTION NO.  3:21-cv-00480

BONSAL AMERICAN, INC.
*formerly known as* Oldcastle Retail, Inc.,
OLDCASTLE BUILDING PRODUCTS INC.
*formerly known as* Oldcastle Retail, Inc.,
OLDCASTLE LAWN & GARDEN, INC.,
JOHN DOES 1-10, and
ABC CORPORTATIONS 1-10

        Defendants.

## <u>MEMORANDUM OPINON AND ORDER</u>

Pending are Defendants Bonsal American, Inc., Oldcastle Building Products Inc., and Oldcastle Lawn & Garden, Inc.'s ("Defendants") (1) Renewed Motion to Exclude Certain Opinions and Testimony of Gary Wolf, [ECF 132, 133], (2) Renewed Motion to Exclude Certain Opinions and Testimony of Timothy Siegel, [ECF 134, 135], and (3) Renewed Motion to Exclude Certain Opinions and Testimony of Michael Ports, [ECF 145, 146], all filed on November 22, 2024.

On the same date, Plaintiff CSX Transportation, Inc. ("CSX") filed its (1) Motion to Exclude the Reports and Testimony of Alan Pagels, Charles Culver, and Robert Gentry [ECF 136, 137], (2) Motion to Exclude the Report and Testimony of Francisco Godoy [ECF 138, 139], and (3) Motion to Exclude the Reports and Testimony of Christopher Lewis. [ECF 140, 141].

The parties have responded in opposition and replied accordingly. The matter is ready for adjudication.

## I.

On September 10, 2021, CSX instituted this action, asserting claims of negligence, negligence per se, *res ipsa loquitor*, trespass, nuisance, and unjust enrichment. [ECF 1]. CSX sought damages for injuries resulting from the alleged claims. [*Id*. at ¶ 24].

On September 9, 2023, Defendants filed a Motion for Summary Judgment and motions to strike the opinions and testimonies of certain experts. [ECF 64, 67, 66, 74]. On the same date, CSX filed a Motion for Partial Summary Judgment and motions to strike experts. [ECF 69, 72, 77, 79].

Both CSX and Defendants filed timely responses and replies to all pending motions. In its briefing, CSX voluntarily dismissed its claims for *res ipsa loquitor* and unjust enrichment. [ECF 94 at 4 n.2]. Additionally, Defendants expressed their intent to withdraw their Motion to Strike Mazzanti testimony. [ECF 102 at 18]. On December 19, 2023, the Court held oral argument regarding the motions for summary judgment. [ECF 110].

On September 30, 2024, the Court granted in part and denied in part the parties' cross-motions for summary judgment. [ECF 124; *see as amended* ECF 126]. The Court denied summary judgment on the negligence claim, finding sufficient evidence for a jury to determine if Defendants owed a duty of care in operating its water management system and whether that duty was breached. [*See generally* ECF 126]. Regarding the trespass claim, the Court concluded CSX "put forth sufficient facts from which a reasonable jury could find Defendants either intentionally or negligently caused water to exit their property and enter Plaintiff's right of way." [*Id*. at 17]. Regarding the nuisance claim, Defendants were awarded summary judgment as the alleged injury

2

arose from a single incident rather than an ongoing event. [*See generally id*. at 18-19]. Additionally, the Court denied summary judgment on the negligence per se claim, finding extant genuine and material factual issues regarding whether the water impounded the Stockpile areas and whether the facilities were exempted from jurisdiction under the Dam Safety Law. [*See generally id*. at 19-23].

Moreover, the Court declined to limit CSX's damages to fair market value, finding a jury should (1) determine if a market exists for the destroyed locomotives, and (2) consider other evidence in determining damages. [*See generally id*. at 23-27]. The Court also concluded some contributory negligence theories were preempted, while others could proceed. Theories related to CSX's train operations and scheduling were preempted, while claims about failure to conduct studies or certain inspections were not preempted. [*Id*.]. Notably, the Court declined to limit damages to a strict fair market value calculation. [*Id*. at 27]. In sum, the negligence, negligence per se, and trespass claims will proceed to trial.

At summary judgment, the Court denied without prejudice the then-pending motions regarding experts to "[permit] the parties to refile these motions [and] ensure that the parties and the Court have the benefit of full briefing in the context of the narrowed case and the issues that remain." [ECF 126 at 47]. The motions described at the outset thus now require adjudication, after having been fully briefed.

On May 9, 2025, the Court granted Defendants' Motion to Seek Leave to Rebut the Ports Declaration and to Offer Expert Testimony on the Fair Market Value of CSX's Locomotives, [ECF 142], scheduled the trial for August 4, 2025, and established the remaining obligations and deadlines for the parties in preparation for trial. [ECF 171].

*Federal Rule of Evidence* 702 "imposes a special gatekeeping obligation on the trial judge to ensure that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *United States v. Hunt*, 99 F.4th 161, 180 (4th Cir. 2024) (quoting *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021) (cleaned up)); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, (1999); *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993). To be deemed admissible, Rule 702 requires the expert's testimony "will help the trier of fact." Fed. R. Evid. 702(a). Notably, effective December 1, 2023, Rule 702 was amended. In a report to the Judicial Conference Committee on Rules of Practice and Procedure, the Advisory Committee pinpointed common mistakes the amendments purport to address:

> [T]he Committee resolved to respond to the fact that many courts have declared that the reliability requirements set forth in Rule 702(b) and (d) --- that the expert has relied on sufficient facts or data and has reliably applied a reliable methodology --- are questions of weight and not admissibility, and more broadly that expert testimony is presumed to be admissible. These statements misstate Rule 702, because its admissibility requirements must be established to a court by a preponderance of the evidence.

*See* Advisory Comm. on Evidence Rules, Report to the Standing Comm. on Rules of Practice & Procedure, (May 15, 2022), https://www.uscourts.gov/sites/default/files/evidence_rules_report_-_may_2022_0.pdf. Moreover, these revisions were intended merely to "clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. Thus, the amendment aims to highlight the burden of proof and admissibility standards—not to drastically alter them.

*Federal Rule of Evidence* 702 is applied in tandem with *Daubert* when courts consider the parties' challenges to expert testimony. In *Daubert*, the Supreme Court observed the

admissibility of scientific evidence was no longer cabined by knowledge or evidence "generally accepted" as reliable in the relevant scientific community. *Daubert*, 509 U.S. at 588-89. The district court is instead instructed to evaluate proposed expert testimony according to Rule 702 with the aim of "ensur[ing] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. The analysis requires the gatekeeper to preliminarily assess whether the reasoning or methodology underlying the testimony is scientifically valid and determine whether the reasoning or methodology can be properly applied to the facts in issue.

The touchstone of reliability is testimony "based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999) (citing *Daubert*, 509 U.S. at 590, 592–93). Multiple factors guide the determination of whether expert testimony is sufficiently reliable to be admissible:

> First, "a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested." A second question . . . is "whether the theory or technique has been subjected to peer review and publication." Publication regarding the theory bears upon peer review; "the fact of publication (or lack thereof) in a peer reviewed journal will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised." Third, "in the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error." Fourth, . . . "'general acceptance'" is . . . relevant to the reliability inquiry. "Widespread acceptance can be an important factor in ruling particular evidence admissible, and a known technique which has been able to attract only minimal support within the community may properly be viewed with skepticism."

*Daubert*, 509 U.S. at 593–94. The factors are non-exclusive and their application depends upon the experts and circumstances in each case. *Kumho Tire*, 526 U.S. at 141. This is in keeping with

5

the "flexible" nature of the inquiry under the "broad discretion" governing the ultimate determination respecting "relevance and reliability." *Oglesby*, 190 F.3d at 250.

On that point in particular, a few further caveats are worth sober consideration. As noted by our Court of Appeals:

> "[T]he trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system, and consequently, the rejection of expert testimony is the exception rather than the rule." Indeed, *Daubert* itself stressed the importance of the "conventional devices" of "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" (rather than wholesale exclusion by the trial judge) as "the traditional and appropriate means of attacking shaky but admissible evidence." . . . .

> When an expert brings science from the laboratory to the courtroom, we have recognized "two guiding, and sometimes competing, principles" that apply. "On the one hand . . . Rule 702 was intended to liberalize the introduction of relevant expert evidence. And, the court need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct." But courts must also recognize that "due to the difficulty of evaluating their testimony, expert witnesses have the potential to be both powerful and quite misleading. And, given the potential persuasiveness of expert testimony, proffered evidence that has a greater potential to mislead than to enlighten should be excluded."

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 631–32 (4th Cir. 2018) (cleaned up).

### III.

**A.  Defendants' Renewed Motion to Exclude Certain Opinions and Testimony of Gary Wolf**

Defendants move to exclude the expert testimony of Gary Wolf as unreliable and irrelevant insofar as he "does not have the necessary expertise to assist the trier of fact" and his opinions "are not based on sufficient facts or data, are not the product of reliable principles and methods, and/or do not apply the principles and methods to the facts of this case." [ECF 132 at 2].

Regarding the necessary expertise, Defendants challenge Mr. Wolf's qualifications related to (1) assessing the wash pond and stockpile area causing water flow across CSX's track,

6

and (2) the X80716 train adding "pressure on the track subgrade but not enough to cause the embankment failure." [*Id*. at 1]. Defendants insist that while his "derailment investigation experience may be sufficient for him to opine on derailment investigations, it does not give him the necessary expertise to opine on the source of the stormwater, whether an impoundment breached rather than overflowed, whether an impoundment was adequately built or maintained, or how stormwater runoff moved across the land's topography." [ECF 133 at 10]. Their primary contention is that he fails to meet the required specialized knowledge and qualifications, "to opine . . . the source of . . . water is from the 'failure' or 'breach' of the wash pond and the stockpile area on Oldcastle's property . . . and whether a water impoundment breached is a question for an expert with specialized knowledge in the area of water impoundment construction and maintenance." [*Id*.]. In sum, they allege Mr. Wolf is "wholly unqualified in those areas." [*Id*.].

CSX responds Mr. Wolf is neither opining on (1) "construction and management of water impoundments" or "storm water management," (2) nor providing opinions regarding construction, management, or maintenance of water impoundments. [*Id*. at 1, 6]. Rather, he "is opining on the cause of the derailment at issue as well as CSX's operations. Wolf is one of the [most], if not the most, highly qualified experts in the area of derailment investigations and rail operations nationally, if not globally." [*Id*.]. CSX references his 53 years of experience in the rail industry and focus on the analysis and prevention of derailments since 1975. [Doc. 65-2, Wolf Report ¶ 2]. Indeed, he has analyzed over 4,000 derailments and published a book on derailment investigations. [*Id*. at 2]. He further has "over 100 publications and presentations involving derailments and rail operations" and "has received multiple awards and honors in this field." [*Id*. at 3].

The Court has an obligation, under *Daubert* and Rule 702, to assess the expert qualifications and address whether the expert is "qualified ... by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. In offering an assessment of expert qualifications, the Court must "consider the proposed expert's full range of experience and training" and not "just professional qualifications." *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 162 (4th Cir. 2012). Mr. Wolf's area of expertise encompasses water to the extent it contributes to derailments. The proper approach to challenge his expertise is thus limited to timely objections, counterevidence, and cross examination.

Defendants' further challenges include: (1) issues surrounding the presence of a makeshift sandbag, (2) eyewitness testimony respecting the track washout being caused by stormwater from the wash pond, not the stockpile area, matting down vegetation to the west of the derailment, (3) post-tornado warning track inspections, and (4) the defective track alignment being "a non-structural problem caused by the sidetrack switch." [ECF 132 at 2].

Respecting the first challenge, Mr. Wolf appropriately addresses Chad Beverly's testimony regarding the "blown out" sandbag. [ECF 151 at 11]. The issue is one of weight and not admissibility. Respecting the matted-down vegetation and accompanying eye-witness testimony, the matter has already been addressed [ECF 126 at 15 (providing "Not only does the Court find the scene presented in the photograph inconclusive, but an additional aerial photograph of the scene presents information from which a reasonable jury could conclude that the water came from Defendant's property.")]. Respecting the post-tornado track inspections, the authority relied upon by CSX, namely, 49 CFR § 213.239, triggers no special inspection duty following a tornado warning. Finally, Defendants assert Mr. Wolf's opinion derives from "a faulty assumption and incorrect fact that the sidetrack switch is at MP 270.44, when in fact the switch is 314 feet away

8

at MP 270," [ECF 133 at 23]. The distance, and varying conceptions of the word "near," however, make plain that categorical exclusion is entirely inappropriate [ECF 151 at 16, *see also* ECF 65-34].

Based upon the foregoing discussion, the Court **DENIES** Defendants' Motion to Strike Expert Report of Gary Wolf. [**ECF 132**]. Insofar as Defendants' Motion in Limine reiterates the same contention presented here, the Court **DENIES** Defendants' Motion in Limine No. 13 [**ECF 176**] on the same aforementioned grounds.

### B. *Defendants' Renewed Motion to Exclude Certain Opinions and Testimony of Timothy Siegel*

Defendants move to exclude the expert testimony of Timothy Siegel "because Plaintiff cannot meet its burden of establishing that Mr. Siegel's opinions satisfy the admissibility requirements." [ECF 134 at 1]. Specifically, they seek to exclude certain of his opinions on the following bases: (1) he is merely "adopting" the CSX position regarding a lack of indication of track or bed instability, (2) his statement regarding the alleged berm breach of the plant pond relies entirely on Chad Beverly's accounts, (3) his statements regarding the flow of water and intersection of the track as related to the plant pond rely solely on the opinion of a CSX employee, (4) his commentary regarding ground instability relies entirely on the opinion of a CSX employee, and (5) his label and arrow in his report Figure 1.

First, CSX purports Mr. Siegel is qualified to opine as a rebuttal expert. [*See generally* ECF 150 at 1-3]. Specifically, he was "engaged as a rebuttal expert for the principal purpose of evaluating the reliability of the engineering opinions of Defendants' proffered experts, Francisco Godoy and Chris Lewis, as to the cause of the collapse of CSX's railroad tracks on September 16, 2018." [*Id*. at 2] (cleaned up). There is no basis for quarreling with this observation.

9

CSX asserts the "historical stability of CSX's track, the breach of Oldcastle's pond, and the flow of water from Oldcastle's pond, are merely disputations of the record and go to the weight, not the admissibility, of Siegel's substantive opinions." [*Id*. at 4]. CSX further contends that, stripped to its fundamentals, in opposition to the positions proposed by Mr. Godoy and Mr. Lewis, "water flowing over the track is the more reliable engineering explanation for the track instability." [*Id*. at 3]. CSX observes that Mr. Siegel remains within the appropriate confines of his role by "offer[ing] a comparative analysis regarding the reliability of Oldcastle's experts' treatment of these facts." [*Id*.]. CSX also includes extensive support for its position Mr. Siegel "relies upon these facts as a framework to criticize the opinions of Godoy and Lewis, [and] those assumptions are subject to cross-examination at trial." [*Id*. at 4]. CSX is correct.

Regarding the illustrative diagram addressing the concentration of water from Oldcastle's property giving rise to the track instability, CSX avers it is reliable and admissible. CSX provides "[m]ultiple eyewitnesses . . . [who] testified that water escaped from two points on Oldcastle's property–a Wash Pond and stockpile berm–which converged at CSX's tracks where they washed out and CSX's train derailed." [*Id*. at 12 (referencing ECF 71-20 at 137:14-15 (Beverly Dep.); ECF 71-19 at 152:9-22 (Callaway Dep.); ECF 71-17, at 79:22-83:1 (Powers Dep.); ECF 89-6 at 18:21-19:23 (Lowe Dep.)]. The purpose of Mr. Seigel's opinion is "to evaluate the soundness of the 'engineering' opinions offered by Godoy and Lewis so that the jury has a means to assess the reliability of Oldcastle's experts' anticipated testimony." [*Id*. at 8]. To the extent it relies upon the eyewitness testimony of the aforementioned CSX employees, cross examination, counterevidence and argument, and appropriate credibility challenges are the means to challenge the evidence.

In their reply, Defendants propose their position that "[t]he real issue with the Opinions in Dispute is that Siegel parrots Beverly's theory of the case, without performing any verification or analysis. To do so is to endorse a layperson's opinion as an expert opinion, which is dangerously misleading to a jury." [ECF 161 at 4]. This is inaccurate.

The *Federal Rules of Civil Procedure* indicate that rebuttal evidence is that which is "intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C)." Fed. R. Civ. P. 26(a)(2)(D)(ii). While Defendants assert Mr. Siegel merely "parrots" witness Chad Beverly and "performed no expert analysis whatsoever of the Opinions in Question," Mr. Siegel is qualified, reasonably relies on fact witness testimony, developed his position utilizing his 30 years of experience as a geotechnical engineer, and engaged with fellow expert reports as sanctioned by the *Federal Rules of Evidence*. *See* Fed. R. Evid. 703 (providing opinions may be based "on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."); *see also Westfield Ins. Co. v. Harris*, 134 F.3d 608, 612 (4th Cir. 1998); *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 789 (7th Cir. 2017) (stating "there is nothing objectionable about an expert relying upon the work a colleague."). There is simply no legal basis for the subject challenge, and the Court rejects it.

Based upon the foregoing discussion, the Court **DENIES** Defendants' Motion to Exclude Certain Opinions and Testimony of Timothy Siegel. [**ECF 134**]. Insofar as Defendants' Motion in Limine reiterates the same contention presented here, the Court

**DENIES** Defendants' Motion in Limine No. 15 [**ECF 176**] on the same aforementioned grounds.

### C. *Defendants' Renewed Motion to Exclude Certain Opinions and Testimony of Michael Ports*

Defendants next challenge CSX expert Michael Ports. [ECF 145, 146]. They contend the following opinions are unreliable and inadmissible: (1) "the alleged breach of the Wash Pond occurred before the derailment, not after," (2) "[t]he alleged breach of the Stockpile Area occurred shortly after the Wash Pond breach and shortly before the derailment," and (3) "Oldcastle's Operations were not designed, constructed, operated, and maintained to prevent (or not result in) flooding of the CSX railroad during a 25-year-rain event." [ECF 146 at 2].

In formulating his timing opinions, Mr. Ports referenced a variety of materials and utilized (1) personal inspection of the properties, (2) "together with the ample fact witness, video, [and] photographs that he reviewed." [*Id*. at 4]. Defendants dispute his timing conclusions. And the result is that the issue is properly joined for trial in compliance with Rule 702.

Regarding the 25-year-rain event, Mr. Ports ascertains "water and erosion controls on Oldcastle's property were not capable of withstanding a 25-year storm." [ECF 149 at 9]. Defendants believe Mr. Ports' opinions mistakenly "assume Florence was a 25-year event instead of a 50-100-year event . . . [and] a breach during a 50- to 100-year event . . . does not indicate that the Wash Pond and Stockpile Area would have breached during a 25-year event." [ECF 146 at 15]. As CSX notes, it is not Mr. Ports' "position that the Wash Pond should not have overflowed at all during Florence if it was constructed with a reasonable design. A design standard of a minimum 25-year standard would require replacement of the dirt 'spillway' of the Wash Pond with a more robust means of controlling overflow." [ECF 149 at 11]. Again, Defendants' challenge is one of weight and not admissibility.

12

Accordingly, the Court **DENIES** Defendants' Motion to Strike Expert Report of Michael Ports. [**ECF 145**]. Insofar as Defendants' Motion in Limine reiterates the same contention presented here, the Court **DENIES** Defendants' Motion in Limine No. 14 [**ECF 176**] on the same aforementioned grounds.

### D. *CSX's Motion to Exclude the Reports and Testimony of Alan Pagels, Charles Culver, and Robert Gentry*

CSX seeks to exclude three of Defendants' experts, namely, Alan Pagels, Charles Culver, and Robert Gentry, asserting their opinions "relate to a [negligence] theory of liability that this Court concluded is preempted pursuant to the [Interstate Commerce Commission Termination Act ("ICCTA") or the Federal Railroad Safety Act ("FRSA")]." [ECF 137 at 2 (referencing ECF 126 at 29-32)] (cleaned up). They additionally challenge the experts' assertions as (1) "self-serving [and speculative] opinions that CSX could have voluntarily implemented alternative operations . . . ," (2) involving information "ultimately unhelpful to the trier of fact," and (3) "based on pure ipse dixit." [*Id.* at 3].

Defendants respond (1) "Mr. Pagels' qualifications as a track expert allow him to opine on CSX's failure to act prudently to meet the standards of care established by federal regulations and industry standards in regards to the derailment," (2) Mr. Culver is qualified to opine on "CSX's failure to act prudently in light of the federal standard of care established by § 213.239" and his opinion is reliable and relevant, and (3) Robert Gentry is qualified to address "CSX's failure to act prudently in compliance with federal regulations in regards to the derailment and the cause of the trackbed collapse" and his opinion is reliable and relevant. [ECF 147].

Regarding preemption, Defendants clarify their intentions at trial in the following manner:

In light of the Court's Amended Order, Oldcastle will not be presenting expert opinion testimony or evidence that has been precluded by the Amended Order's adverse preemption rulings. This includes opinions and testimony of Alan Pagels, Charles Culver and Robert Gentry on train scheduling, network operations, failure to add a culvert at MP 270.4, reporting of high water on the tracks, Precision Scheduled Railroading, 49 C.F.R. § 213.5, FRA Safety Advisory 97-01, MWI 1110-02 and internal rules 100.1, 105, and 301.7. Oldcastle reserves all rights, including the right to appeal the adverse preemption rulings, and does not waive such right to appeal.

[*Id*. at 2, fn.1]. Notably, the Court expressly provided "preemption does not apply where the allegation is based on a party's 'fail[ure] to comply with . . . a federal standard of care established by a regulation or order." [ECF 126 at 38]. Moreover, "[a] genuine issue of material fact exists as to whether additional occurrences arose such that Plaintiff had a duty to conduct another special inspection." [*Id*. at 39].

There is a line between prohibited testimony respecting a preempted common-law negligence claim on the one hand, and expert testimony illuminating a federal standard of care on the other. The circumstances at trial will more sharply elucidate on which side of the line particular testimony falls. Categorical exclusion is thus inappropriate.[1] The further challenges to the three experts are addressed in the subsections that follow.

### 1. Alan Pagels

Defendants assert as follows respecting Mr. Pagels: "[he can] opine on . . . railroad track safety and CSX's compliance with the federal standard of care encompassed in FRA §§ 213.239 and 213.33. These issues are well within his field of expertise and his opinion will aid the trier of fact in understanding the evidence and resolving factual disputes." [ECF 147 at 2]. In view of Mr. Pagels' qualifications, "railroad track safety and CSX's compliance with the federal

---

[1] Inasmuch as the currently pending Motion in Limine to Exclude Evidence and Testimony Regarding Topics that the Court Found Preempted [ECF 200], filed by CSX on June 23, 2025, is inherently similar in nature, the Court **DENIES** the motion in limine, [**ECF 200**], and relies on the same rationale set forth here. In sum, the request is unduly expansive.

14

standard of care encompassed in FRA §§ 213.239 and 213.33" are clearly within his area of expertise. [*Id*. at 3]. Defendants have also adequately demonstrated Mr. Pagels' opinions are based on reliable and widely accepted grounds, such as reviewing "photographs, train video footage, CSX documentation regarding the derailment, expert reports, deposition transcripts and exhibits, FRA regulations and guidance, and other materials." [*Id*. at 9 (referencing ECF 81-23 at 65)]. Moreover, he "analyzed these materials based on his specialized training, experience and knowledge in railroad track safety and compliance to determine whether CSX acted prudently in light of the standards of care established by FRA regulations and ordinary care/industry standards." [*Id*.]. The Court agrees his methodology reflects a "well-grounded" approach. [*Id*.]. Moreover, his opinion is "relevant and helpful to the jury because it was therefore "possible" (under § 213.239) for CSX to have inspected the track." [*Id*. at 10].

Regarding the proposed exclusion in light of the "subsequent remedial measure" rule contained in Rule 407 -- CSX is misguided. *Federal Rule of Evidence* 407 provides subsequent remedial measures, while not admissible to prove negligence, culpable conduct, or a defect in a product or its design, may be admitted for other purposes, "such as impeachment or — if disputed — proving ownership, control, or the feasibility of precautionary measures." Fed. R. Evid. 407. Defendants accurately contend that "Mr. Pagels' opinion is that it was possible (aka feasible) for CSX to inspect ahead of the trains before the derailment because it had ordered its inspectors to do so after the derailment." [ECF 147 at 13]. Inasmuch as Mr. Pagels' testimony at this juncture speaks to the feasibility, which is an accepted vehicle, the testimony is admissible. Counsel is permitted to raise an appropriate objection at trial if the circumstances warrant. *See Werner v. Upjohn Co.,* 628 F.2d 848, 854–55 (4th Cir. 1980) (allowing "evidence of subsequent remedial

measures to be used to prove the feasibility of such measures, but only if feasibility is controverted by the defendant.")).

Based on the foregoing, the Court **DENIES** CSX's Motion to Strike Expert Report of Alan Pagels.

To the extent CSX renews a similar argument regarding subsequent remedial evidence in its Motion in Limine to Exclude Evidence and Testimony Regarding Subsequent Remedial Measure Evidence by CSX Transportation, [ECF 204, 205], the Court remains unconvinced. As Defendants note "[b]ecause CSX contests the feasibility of running a track inspector in front of trains, the evidence CSX challenges in this Motion is admissible to prove that it was feasible to run an inspector in front of Q583 before the derailment." [ECF 231 at 3]. If Defendants' stray beyond the subject of feasibility, CSX may lodge a timely objection. The Court **DENIES** the motion in limine. [**ECF 204**].

### 2. Charles Culver

Defendants set forth at length in their memorandum Mr. Culver's qualifications. [*See generally* ECF 147 at 15-16]. Additionally, Mr. Culver "reviewed photographs, train video footage, deposition transcripts and exhibits, weather reports, audio recordings, CSX incident report on the derailment, FRA regulations and guidance, pleadings, and other materials." [*Id*. at 17 (referencing ECF 81-25 at 2-3)]. Furthermore, he utilized an accepted methodology and incorporated therein his extensive specialized "training, experience and knowledge in railroad operations." [*Id*.]. He is plainly qualified to opine on CSX's putative failure to "act prudently in light of the federal standard of care established by § 213.239," and he has a sound basis at this point to so opine. [*Id*. at 16]. Inasmuch as Mr. Culver's report and testimony reflect a "reliable

foundation" relevant "to the task at hand" -- Defendants have met their burden for admissibility. *Daubert*, 509 U.S. at 597; *see also* Fed. R. Civ. P. 702.

Based on the foregoing, the Court **DENIES** CSX's Motion to Strike Expert Report of Charles Culver.

### 3. Robert Gentry

Given Mr. Gentry's significant qualifications, [ECF 147 at 18-19], he is plainly qualified inasmuch as he holds "specialized knowledge, skills, experience, and training . . . to give expert opinions in this case on the subject matter of safety and regulatory compliance." [*Id*. at 19].

CSX challenges his reliability and relevance. In response, Defendants suggest he should be permitted to opine on CSX's imprudence inasmuch as Mr. Gentry (1) followed a well-accepted, reliable methodology, (2) analyzed "photographs, train video footage, CSX documentation of the derailment, audio recordings, expert reports, deposition transcripts and exhibits, FRA regulations and guidance, weather reports, and other materials," (3) utilized appropriate Google Earth images, and (4) "properly referred to the CSX report in August of 2016 of an alignment defect problem.'" [*Id*. at 20-23]. Mr. Gentry's opinions are "based on scientific, technical, or other specialized knowledge and not on belief or speculation," and, furthermore, his "inferences . . . [are] derived using scientific or other valid methods." *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999) (citing *Daubert*, 509 U.S. at 590, 592–93). His challenged opinions are thus not subject to being stopped at the gate.

Accordingly, CSX's Motion to Exclude the Reports and Testimony of Alan Pagels, Charles Culver, and Robert Gentry is **DENIED**. [**ECF 136**]. The Court additionally notes that CSX's Motion in Limine to Exclude Evidence and Testimony Relating to Unauthenticated Google Earth Images, [ECF 192], is premature. If Defendants do not properly authenticate the subject

17

images at trial, exclusion may be the remedy. At present, the Court **DENIES** CSX's Motion in Limine to Exclude Evidence and Testimony Relating to Unauthenticated Google Earth Images **[ECF 192]**.

### E. *CSX's Motion to Strike Expert Report of Francisco Godoy*

CSX moves to exclude the expert testimony of Francisco Godoy as lacking reliability and relevance. [*See generally* ECF 138, 139]. In general, CSX categorizes Mr. Godoy's testimony as opining "the root cause of the derailment was a track bed failure attributable to saturated soil collapsing in response to Florence." [ECF 139 at 3]. CSX asserts (1) his opinions regarding soil modeling are flawed as being based on a Track Chart containing no relevant track bed data, (2) he improperly inverted and misused the Track Chart as if it was a cross-sectional diagram of CSX's tracks, (3) his soil modeling relies on "unjustified assumptions" about the X807 locomotive forces on the track bed, (4) he fails to explain how an earlier train safely traversed the same track area before the derailment, (5) his models calculate only static forces rather than dynamic forces of moving trains, and (6) his affidavit contradicts his deposition testimony regarding the basis for his modeling. [*See generally* ECF 139]. Regarding the affidavit, CSX contends it is a transparent attempt to "walk back" his defective modeling. Specifically, CSX notes Godoy attempted to present an alternative basis for his modeling, abundantly "illustrating he lacks sufficient facts or data to perform his modeling and, if believed, confirms that he invented certain aspects of his model from whole cloth." [*Id.*]. CSX contends "[his] opinions are not based on sufficient facts or data to support the sound application of engineering principles, and are therefore unreliable and inadmissible." [*Id.* at 4]. In the alternative, CSX requests that his testimony should be "in tandem with" CSX expert Tim Siegel. [*Id.* at 3].

Regarding soil modeling and saturation, Defendants state Mr. Godoy's opinions were based upon an on-site analysis, extensive review of documents and images, and video footage. [*Id*. at 7]. Moreover, he "reviewed and considered evidence that approximately 10.4 inches of rainfall from Florence had fallen at the Oldcastle property in the 48 hours preceding the derailment." [*Id*. at 7 (referencing ECF 81-22 at 26-27)]. They additionally note he "developed and performed multiple soil failure analyses based on different water table levels to demonstrate from an engineering standpoint the effect of the X807 train transiting over the embankment at the derailment location under varying saturation conditions, including no water in the soil (no saturation), partial saturation and full saturation." [*Id*. at 8]. In a further attempt to diminish any uncertainties, he conducted further soil failure analysis and "performed multiple slope/soil stability analyses for realistic load scenarios when the X807 train transited the derailment location under different potential soil compositions and degrees of saturation." [*Id*. (referencing ECF 81-22 at 25)]. In sum, Mr. Godoy's opinion regarding saturation is based on scientific, technical, or other specialized knowledge – not simply belief or speculation – and his testimony is not subject to categorical exclusion. *Oglesby v. General Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999); *see also Daubert*, 509 U.S. 579, 590–93.

Further regarding the soil profile modeling, Defendants explain "[w]hen Godoy reviewed the Track Chart, he inadvertently misinterpreted it as depicting a trackbed profile in addition to a general plan view of the CSX track map at the derailment location." [*Id*. at 10]. Specifically,

> Godoy's misinterpretation arose from the fact that it appeared to depict a substantially similar profile to what Godoy had already determined to be the trackbed profile based on his review and analysis of field measurements, site observations, CSX specifications, satellite images, and other evidentiary photographs and documents. [ECF 91-12 at 7]. Godoy only used the Track Chart image to show that an apparent plan view of the CSX tracks depicted a similar

19

trackbed profile to Godoy's determinations of the general layout and dimensions of the trackbed at the derailment site. (*Id*. at 7). In other words, Godoy's sole purpose for using the Track Chart in his reports was to illustrate that his determination of the trackbed dimensions was consistent with, and corroborated by what appeared to be CSX's own rough depiction of the track profile. (*Id*.) Godoy did not, nor could he have relied upon the Track Chart to create the track profile for his soil failure models, since among other issues, the Track Chart was devoid of any measurements or dimensions and was otherwise inconsistent in several material respects from Godoy's evidentiary observations. (*Id*.)

[ECF 148 at 10-11].

The Court agrees. CSX's position is baseless. A single, explainable, inadvertent inclusion of an image does not support the wholesale rejection of an opinion. This is especially so considering his experience and his reliable methodology. *See generally E.E.O.C. v. Freeman*, 778 F.3d 463, 467 (4th Cir. 2015) (striking an expert's opinion where there were a "'mind boggling' number of errors and unexplained discrepancies.")).

Regarding the soil composition of the trackbed, Defendants contend Mr. Godoy sufficiently reviewed "within a reasonable degree of engineering certainty potential subgrade soil compositions of the CSX embankment on the date of the derailment." [*Id*. at 16]. In particular, he "analyzed soil data for the derailment location based on reliable government sources, determined the most likely soil types for the derailment location and confirmed that those soil types were consistent with color photographs and news footage of the derailment showing the exposed subgrade." [*Id*. (referencing ECF 81-22 at 18, 21, ECF 80-3 at 18, ECF 91-12 at 7, ECF 80-4 at 31:21-32:14)]. The Court finds Mr. Godoy's analysis is adequately supported and reliable. *See Nease v. Ford Motor Co*., 848 F.3d 219, 229 (4th Cir. 2017); *see also Kumho Tire Co., Ltd.*, 526 U.S. at 141.

Regarding the force of the CSX train X807, Defendants challenge CSX's position and cite his first report, where he "provided a detailed discussion of the evidence he reviewed and

the engineering analysis and calculations that he performed in order to determine the potential range of pressure loads that [the] train X807 exerted on the trackbed." [*Id*. at 17 (referencing ECF 81-22 at 20-30)]. They contend his focus on the static load allowed him to "employ[] a conservative engineering approach, since a consideration of dynamic forces would only increase the pressure calculations and failure rates in Godoy's soil failure analyses." [*Id*.]. They assert CSX "misunderstands and misrepresents the nature of Godoy's static load analysis" inasmuch as the static assessment means he "only analyzed the vertical forces exerted by the train's weight at a specific point in time, which forces could be determined by known evidence." [*Id*. at 18]. Insofar as his explanation for focusing on the static nature "rests on a reliable foundation and is relevant to the task at hand" it is deemed admissible. *Daubert*, 509 U.S. at 597.

Regarding the consideration of material maintained by the American Railway Engineering and Maintenance-of-way Association, ("AREMA"), in the performance of Mr. Godoy's analysis, and contrary to CSX's assertions, Mr. Godoy adequately asserts he (1) "had [a] reasonable engineering basis to rely upon AREMA information as part of his analysis," and (2) in response the CSX's argument, he offered an excerpt from AREMA "which recommends a similar analysis to the one that Godoy performed." [*Id*. at 21].

Next, Defendants assert Mr. Godoy permissibly opines on why an earlier X807 locomotive could safely traverse the area when the later model derailed. They contend "his models demonstrate that the pressure load impacts of the lead X807 locomotive on the trackbed would be sufficient under certain conditions to fracture the soil and initiate a soil collapse, and further explains how the failure would continue to worsen as the X807 train continued to transit the location." [*Id*. at 22]. The Court agrees. Mr. Godoy "provided a detailed engineering analysis in both of his Reports in which he explained from an engineering standpoint how the first train X807

was able to transit the location of the derailment unscathed." [*Id.* (referencing ECF 81-22 at 18, 22, and 26; ECF 80-3 at 13-14, 16-17)].

Regarding CSX's primary concerns regarding the objections to Mr. Godoy's Affidavit -- the Court notes the question of permissible supplementation is guided by *Federal Rule of Civil Procedure* 26(e). *See generally* Fed. Civ. P. 26(e)(2) (providing the "party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due."). Mr. Godoy's Affidavit is permissible under Rule 26(e)(2). If otherwise proper, any last-ditch effort to salvage or otherwise rehabilitate his opinions after the fact may be a proper subject for cross examination.

While CSX attempts to cast doubt upon and challenge the accuracy of the underlying review by Mr. Godoy, he has proffered testimony and support based on reliable facts and evidence. Thus, it is clear the totality of Mr. Godoy's testimony does not indicate such deficiency as to justify wholesale exclusion. Accordingly, the Court **DENIES** CSX's Motion to Strike Expert Report of Francisco Godoy. [**ECF 138**].

### F. *CSX's Motion to Exclude the Reports and Testimony of Christopher Lewis*

CSX seeks to exclude Christopher Lewis' testimony on three primary grounds: (1) his opinions criticizing CSX's train operation decisions are preempted by the Court's summary judgment ruling, (2) his opinions defending Oldcastle's stormwater management are unreliable because he provides no methodology or standard of care to support his conclusion water was redirected in a "safe manner," and (3) his speculation about a void or cavern beneath the tracks lacks "evidentiary support" and is merely "conjecture." [ECF 141].

Regarding preemption, the Court's prior order stated as follows:

> [A]ny arguments that Plaintiff should have ceased or altered operations on September 16, 2018, are expressly preempted by the ICCTA because such arguments attempt to impose regulations on Plaintiff regarding when and how to run its trains. Because this Court finds these arguments are preempted under the ICCTA, it need not consider the parties' arguments regarding whether, under the FRSA, the defense is preempted or falls within an exception to preemption.

[ECF 126 at 47]. CSX asserts as follows: "the Court's Opinion found Oldcastle's contributory negligence argument regarding how or when CSX decided to operate its trains as preempted, rendering Lewis's opinion irrelevant and highly prejudicial on this topic." [ECF 141 at 4]. Moreover, CSX asserts, the Court should find he "lacks scientific, technical, or other specialized knowledge regarding railroad operations and/or scheduling trains to present a reliable opinion." [*Id*.]. CSX asserts his opinion, "suggests that CSX could have operated 'more diligently' or suspended train operations, [and that] is merely an attempt to directly regulate how and when CSX operates its train." [*Id*.]. Defendants respond as follows:

> In light of the Court's Amended Order and reserving all rights and without waiving Oldcastle's right to appeal the adverse preemption rulings, Oldcastle will not present expert opinions testimony or evidence that has been precluded by the Amended Order's adverse preemption rulings. Specifically, in regards to Lewis, he will not opine that CSX "could have mitigated risks and potentially avoided the derailment by operating more diligently through the storm region, and/or by suspending train traffic through these areas of flooding until the storm ceased and their track could be thoroughly inspected, and significant damage corrected if/where it occurred."

[ECF 152 at 6 (quoting ECF 141 at 4)]. Absent a contrary course by Defendants at trial, the matter appears moot.

Respecting the balance of the challenge, Mr. Lewis' detailed resume, qualifications, and significant credentials caution restraint on any categorical exclusion request. It is noteworthy "Oldcastle retained Lewis to provide an engineering opinion evaluating CSX's washout theory and the root cause of the derailment and to rebut CSX's causation experts. These issues are well

within Lewis' field of expertise, and his opinions will aid the trier of fact in understanding the evidence and resolving factual disputes." [ECF 152 at 6; *see generally id*. at 6-8].

In order to meet the reliability threshold, Mr. Lewis' opinions must be based on scientific, technical, or other specialized knowledge, not simply belief or speculation. *Oglesby v. General Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999); *see generally Daubert*, 509 U.S. 579 (1993). Additionally, the testimony must "rest on a reliable foundation and [be] relevant to the task at hand." *Nease*, 848 F.3d at 229 (4th Cir. 2017) (quoting *Daubert*, 509 U.S. at 593); *see also Kumho Tire Co., Ltd.*, 526 U.S. at 141. In this instance, his opinions satisfy both requirements.

Accordingly, the Court **DENIES** CSX's Motion to Strike Expert Report of Christopher Lewis. [**ECF 140**].

## G. CSX's Motion in Limine to Exclude Evidence and Testimony Regarding Defendants' Conflicting Expert Opinions

CSX aims to exclude, by way of *motion in limine*, the "conflicting" testimony of Mr. Lewis, Mr. Godoy, and Mr. Pagels because "all present conflicting theories regarding the stability of the track in question and the factors leading to its collapse, despite being experts retained for the same company." [ECF 189 at 1]. They allege "the absence of a unified theory contributes to a lack of clarity and will likely impede the jury's ability to discern relevant facts." [*Id*.].

Defendants express "Oldcastle retained experts who investigate independently, analyze independently, and form opinions independently. The experts do not need to have one unified theory; it is permissible for each expert to have his own individualized theory." [ECF 214 at 2]. In addition, they purport the opinions are not in conflict, and instead "wholeheartedly reject CSX's threshold theory that stormwater from the Oldcastle property washed out CSX's railroad trackbed." [*Id*.].

The Court agrees. The experts, as discussed extensively above, are all individually reliable, they are not required to be unified, and their testimony is not irreconcilable in relation to the defined roles of their testimony. To the extent CSX seeks to address cohesivity, they may avail themselves the opportunity to cross-examine the experts as they see fit.

Accordingly, the Court **DENIES** CSX's Motion in Limine to Exclude Evidence and Testimony Regarding Defendants' Expert Reliance Materials. [**ECF 188**].

### H.  CSX's Motion in Limine to Exclude Evidence and Testimony Regarding Hydrology Studies

CSX next moves to preclude Defendants from presenting evidence related to whether CSX should have conducted a hydrology study inasmuch as the same is irrelevant and a waste of time. [*See generally* ECF 196, 197]. It also moves to restrict Oldcastle's experts, including Mr. Pagels, from opining about the necessity to conduct hydraulic studies beyond the scope of their reports. [ECF 197 at 3].

Defendants' response provides their position that "CSX cannot claim surprise or bad faith and Oldcastle's expert Pagels should be able to opine on and explain and elaborate upon matters within his reports (and purportedly outside of the scope of his reports) within his area of expertise." [ECF 221 at 4]. Specifically, they assert "[e]vidence relating to CSX's failure to conduct flood or hydraulic studies in the area of the derailment is integrally relevant to Oldcastle's contributory negligence defense." [*Id*. at 2]. Defendants call attention to the notion that "[t]his is CSX's third attempt at the apple." [*Id*. at 2, (referencing ECF 126 at 35-36, ECF 165 at 9)]. The Court agrees. Defendants are seeking to assert their defense of contributory negligence and its supporting evidence -- as they are allowed to do within the limits of the summary judgment opinion.

25

Accordingly, the Court **DENIES** CSX's Motion in Limine to Exclude Evidence and Testimony Regarding Hydrology Studies. [**ECF 196**].

**IV.**

Based upon the foregoing discussion and analysis, it is accordingly **ORDERED** as follows:

1. Defendants' Motion to Strike Expert Report of Gary Wolf is **DENIED** [**ECF 132**];

2. Defendants' Motion in Limine No. 13-15 is **DENIED** [**ECF 176**];

3. Defendants' Motion to Strike Expert Report of Michael Ports is **DENIED** [**ECF 145**];

4. CSX's Motion to Exclude the Reports and Testimony of Alan Pagels, Charles Culver, and Robert Gentry is **DENIED** [**ECF 136**];

5. CSX's Motion in Limine to Exclude Evidence and Testimony Relating to Unauthenticated Google Earth Images is **DENIED [ECF 192]**;

6. CSX's Motion to Strike Expert Report of Francisco Godoy is **DENIED** [**ECF 138**];

7. CSX's Motion in Limine to Exclude Evidence and Testimony Regarding Defendants' Expert Reliance Materials is **DENIED** [**ECF 188**];

8. CSX's Motion in Limine to Exclude Evidence and Testimony Regarding Subsequent Remedial Measure Evidence is **DENIED** [**ECF 204**];

9. CSX's Motion in Limine to Exclude Evidence and Testimony Regarding Topics that the Court Found Preempted is **DENIED** [**ECF 200**];

10. CSX's Motion to Exclude the Reports and Testimony of Christopher Lewis is **DENIED** [**ECF 140**]; and

11. CSX's Motion to Exclude Evidence and Testimony of Hydrology Studies is **DENIED**. [**ECF 196**].

The Court **DIRECTS** the Clerk to transmit a copy of this written opinion and order to counsel of record and any unrepresented party.

ENTER: July 9, 2025

Frank W. Volk
Chief United States District Judge